

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-15-2000

# United States v. Saada

Precedential or Non-Precedential:

Docket 99-5126 & 99-5148

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"United States v. Saada" (2000). *2000 Decisions.* Paper 97.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/97

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed May 15, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 99-5126 & 99-5148

UNITED STATES OF AMERICA,
        Appellee,

v.

NEIL SAADA and ISAAC SAADA, a/k/a Zuckie,
        Appellants.

Appeal from the United States District Court
for the District of New Jersey
D.C. Criminal No. 96-cr-00047
District Judge: Honorable John C. Lifland

Argued: December 16, 1999

Before: NYGAARD and RENDELL, Circuit Judges, and
HARRIS, District Judge.*

(Filed: May 15, 2000)

_____

* Stanley S. Harris, Senior District Judge for the District of Columbia,
sitting by designation.

Edna Ball Axelrod, Esq. (Argued)
76 South Orange Avenue, Suite 305
South Orange, N.J. 07079

Paul Brickfield, Esq.
70 Grand Avenue
River Edge, N.J. 07661

Norman Gross, Esq. (Argued)
Office of the United States Attorney
One John F. Gerry Plaza
Fourth and Cooper Streets
Camden, N.J. 08101-2098

James F. McMahon, Esq.
Office of the United States Attorney
970 Broad Street
Newark, N.J. 07102-2535

OPINION OF THE COURT

HARRIS, District Judge.

This appeal arises out of a factual setting of unusual corruption, involving a flooded portion of a warehouse resulting from a broken sprinkler head; a fraudulent insurance claim filed by a father and son; a cousin who took part in the scheme, but later testified against his relatives as a government witness, only to be caught on tape by the government encouraging an individual to falsely implicate someone in a different crime; and the use at trial of a statement by a deceased state court judge who had been removed from the bench and disbarred for unethical conduct. It requires us to apply our standards governing new trials under Federal Rule of Criminal Procedure 33 and a prosecutor's vouching for the credibility of witnesses, and to interpret the intersection of two rules of evidence.

A jury convicted Isaac Saada and his son, Neil Saada (collectively "appellants" and sometimes identified by their first names), of one count of conspiracy to defraud an insurance company in violation of 18 U.S.C. S 371, two counts of mail fraud in violation of 18 U.S.C. S 1341, and

2

one count of wire fraud in violation of 18 U.S.C.S 1343. The District Court sentenced Isaac to concurrent prison terms of 36 months, and Neil to concurrent prison terms of 30 months. Shortly after being sentenced, appellantsfiled a motion for a new trial on the basis of newly discovered evidence, which the District Court denied. Appellants challenge the District Court's denial of their motion for a new trial, a number of its evidentiary rulings made during the trial, and the propriety of certain statements made by the government during its rebuttal argument. We will affirm.

## I. BACKGROUND

### A. Factual Background

Appellants owned and operated a business named Scrimshaw Handicrafts ("Scrimshaw") in New Jersey that purchased, manufactured, and sold items made from ivory, jewels, gold, and other materials. Appellants faced significant financial difficulties. In August 1990, they were sued on a $6 million bank loan made to an entity named Kiddie Craft; each appellant had personally guaranteed the total amount of the loan, and each thus was liable for the amount of the subsequent settlement of the lawsuit-- $3.8 million. During this period, Scrimshaw was operating at a net loss, and ultimately it filed for bankruptcy in June 1991.

The government's evidence at trial showed that, in 1990, appellants contacted Ezra Rishty, Isaac's cousin, for help in an insurance fraud scheme. Rishty was a public insurance adjuster in New York City who had conspired with various clients in over 200 fraudulent insurance schemes in the past. Rishty agreed to assist Isaac in filing a fraudulent insurance claim, and enlisted the help of Morris Beyda, a former employee who by then owned his own business. Rishty also enlisted the help of Sal Marchello, a general adjuster for the Chubb Insurance Group ("Chubb"), which was Scrimshaw's insurer. Marchello assured Rishty that Chubb would assign him to handle the future Scrimshaw claim.

3

The basis of the fraudulent insurance claim was a staged flooding in Scrimshaw's warehouse caused by a broken sprinkler head. Beyda testified that, on November 28, 1990, he went to the warehouse and, with the assistance of Neil, broke a sprinkler head located above a caged area containing Scrimshaw's most valuable merchandise. When Neil and Beyda broke the sprinkler head, Isaac was in his office with Tom Yaccarino, a vice-president of Scrimshaw and former New Jersey state court judge. Breaking the sprinkler head caused a flood of dirty water to fall on the boxes in the cage, which triggered an automatic alarm and prompted police and fire fighters to go to the Scrimshaw warehouse. Neil told them the agreed-upon cover story -- that he had accidentally broken the sprinkler head while moving a heavy box that was piled on top of other boxes in the storage area, near the ceiling. A few days later, Beyda returned to the warehouse and increased the damage by spraying water on boxes of merchandise that previously had not been damaged.

Appellants submitted an insurance claim and proof of loss to Chubb for the merchandise damaged by the purported accident. The proof of loss contained an inventory of the damaged items, which included items that had in fact not been damaged. Appellants retained Rishty's company, United International Adjusters, to assist them with this claim. Chubb assigned Marchello to investigate the claim, who in turn hired Kurt Wagner -- an insurance salver -- to assess the extent of damage and to valuate the merchandise. Wagner took part in the fraudulent scheme by vouching for the accuracy of the proof of loss, without actually inspecting the inventory listed.

Chubb hired an accounting firm to review the valuation in the proof of loss. Appellants were unable to provide invoices for certain merchandise valued at approximately $500,000 that was listed in their claim. Neil informed the accountants that they were having trouble locating these invoices because they were old and stored away in a trailer. Appellants thereafter submitted forged invoices indicating that Scrimshaw had purchased the merchandise in question from a jewelry wholesaler in New York. When the accountants became suspicious about these invoices

4

because they were in "pristine" condition, Marchello told them to accept the invoices and not to investigate any further.

Chubb also sent an investigator to interview appellants regarding the water damage claim. In separate interviews, at which Rishty was present, appellants stated that their business was not facing financial difficulties. Isaac also stated that he had hired Rishty as a public adjuster because he had seen an advertisement of his company, but did not state that he was related to Rishty.

Chubb ultimately paid appellants $865,000 on the fraudulent claim, $270,000 of which appellants paid to Rishty for his role in the scheme. Rishty paid Beyda, Marchello, and Wagner for their roles in the scheme out of his share of the money.

B. Procedural Background

In December 1992, federal agents executed search warrants for the business offices of Rishty and Beyda in New York. Shortly thereafter, Rishty and Beyda agreed to cooperate with the government.[1] Between 1992 and 1997, Rishty spent approximately 3,000 hours, and Beyda spent over 1,000 hours, cooperating with the government in various insurance fraud investigations. In the course of this cooperation, Rishty admitted to having participated in over 200 fraudulent insurance claims. Rishty and Beyda also advised the government of the fraudulent water damage claim submitted by Scrimshaw. Pursuant to their cooperation agreements, Rishty and Beyda pleaded guilty to various fraud-related offenses in the United States District Court for the Eastern District of New York. Rishty also pleaded guilty to conspiracy to commit mail fraud in the United States District Court for the District of New Jersey for his role in the Scrimshaw claim.

---

1. Rishty entered into one cooperation agreement with the United States Attorney for the Eastern District of New York, and another with the United States Attorneys for the District of New Jersey and the District of Connecticut. Beyda entered into a cooperation agreement only with the United States Attorney for the Eastern District of New York.

5

In an indictment filed in the United States District Court for the District of New Jersey, appellants were charged with one count of conspiracy to defraud an insurance company, three counts of mail fraud, and one count of wire fraud.2 Before trial, the District Court dismissed one of the mail fraud counts pursuant to a government motion. At trial, both Rishty and Beyda testified for the government, pursuant to their cooperation agreements, as to appellants' involvement in the fraudulent water damage claim. Appellants' defense was that Rishty and Beyda were falsely implicating them in order to receive the benefit of motions for reduced sentences on the charges to which they had pled guilty. The jury convicted appellants on the four remaining counts in the indictment. After being sentenced, appellants moved unsuccessfully for a new trial on the basis of newly discovered evidence. We now turn to the contentions raised in this appeal.

II. MOTION FOR A NEW TRIAL

Appellants first challenge the District Court's denial of their motion for a new trial under Federal Rule of Criminal Procedure 33. We review that decision for an abuse of discretion. See Government of the Virgin Islands v. Lima, 774 F.2d 1245, 1250 (3d Cir. 1985); United States v. Adams, 759 F.2d 1099, 1108 (3d Cir. 1985).

The new evidence forming the basis of appellants' motion consists of a crime committed by Rishty after appellants had been convicted. In July 1997, Rishty advised an individual named Robert Falack to give false testimony against an innocent third party, under the guise of cooperating with the government, in order to receive a reduced sentence on a pending criminal charge.3 Rishty's urging was captured on audio tape, as Falack wore a wire

_____

2. The indictment also charged Isaac separately in five other counts, but the District Court granted a motion to sever those counts.

3. Because Rishty's conduct violated the terms of his cooperation agreement with the government, the United States Attorney for the Eastern District of New York did not file a motion under S 5K1.1 of the Sentencing Guidelines for a reduced sentence on the charges to which he had pled guilty.

6

during the conversation. The tape reveals that Rishty also told Falack that he would "back up" his story"100 percent," that Rishty admitted to withholding information from the government during his cooperation, and that the government sometimes gave him information about a particular crime when asking him whether it had occurred. Appellants claim that this newly discovered evidence warrants a new trial because it undermines Rishty's testimony and bolsters their trial defense by providing powerful evidence of Rishty's willingness falsely to implicate innocent people in order to receive leniency at sentencing.

At the outset, we note that the newly discovered evidence may also be characterized as "newly created" evidence because Rishty did not encourage Falack to give false testimony until after appellants had been convicted. We share the skepticism expressed by the trial court over the viability of a defendant's application for a new trial that relies solely on evidence of a government witness' bad acts committed after the defendant has been convicted. However, we need not resolve whether this type of evidence may ever warrant a new trial because the relevant evidence in this case does not meet our well-established standard for a new trial. Our case law makes clear that five requirements must be met before a trial court may grant a new trial on the basis of newly discovered evidence:

> (a) the evidence must be in fact newly discovered, i.e. discovered since trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

Lima, 774 F.2d at 1250 (quoting United States v. Ianelli, 528 F.2d 1290, 1292 (3d Cir. 1976)). The movant has a "heavy burden" in meeting these requirements. United States v. Ashfield, 735 F.2d 101, 112 (3d Cir. 1984). We agree with the District Court that appellants did not meet their burden.

7

First, the new evidence in this case fails the requirement that it not be merely cumulative or impeaching. The evidence is only impeaching because there is no exculpatory connection between Rishty's act of counseling Falack to falsely implicate an innocent person in another case and appellants' acts of causing a flooding of their storage area and filing a fraudulent insurance claim. Nothing in Rishty's conversation with Falack supports an inference that appellants were innocent of the charges for which they were convicted.4 The evidence is only cumulative because the jury heard an overwhelming amount of evidence impeaching Rishty's credibility. Among other things, that evidence probed the extent of Rishty's participation in over 200 fraudulent insurance schemes, his criminal record, and his cooperation agreement with the government, under which he was eligible to receive the benefit of a S 5K1.1 motion for a reduced sentence.5 This evidence undoubtedly caused the jury to question the veracity of Rishty's testimony implicating appellants in the fraudulent insurance scheme. Given the abundance of impeachment evidence presented at trial detailing Rishty's propensity for deceitful acts and his incentive for testifying as a government witness, we conclude that the District Court did not abuse its discretion in ruling that the new evidence was merely cumulative.

_____

4. In his conversation with Falack, Rishty referred to Isaac as a "moron" who had "caused his own problem" by backing out of a purportedly favorable plea offer with prosecutors. This comment is not probative of innocence because it evidences Rishty's belief that appellants were guilty.

5. For example, the jury heard evidence that: (1) the total value of the fraudulent claims in which Rishty had participated was approximately $38 million; (2) approximately 20 of Rishty's employees had participated in his fraudulent insurance schemes; (3) Rishty had routinely bribed insurance adjusters and others in the insurance industry in connection with these schemes; (4) Rishty had taken money from his clients by telling them that he needed it for bribes, but had then kept it for himself;
(5) Rishty had received approximately $5 million for his work on fraudulent claims over 6 years; (6) Rishty had pled guilty to mail fraud and tax evasion in federal court in New York, and had pled guilty to insurance fraud in federal court in New Jersey; (7) Rishty had another prior conviction for larceny; and (8) Rishty was testifying as a cooperator
with the hope of receiving a reduced sentence.

8

Nor did the District Court err in concluding that the new evidence failed another requirement for a new trial-- that it would probably produce an acquittal. The District Court reasoned that there was sufficient evidence, independent of Rishty's testimony, to support the jury's findings of guilt.6 In doing so, it emphasized that portions of Beyda's testimony indicating his presence at the Scrimshaw warehouse on the night of the staged flooding had been corroborated by independent evidence. This corroborating evidence established Beyda's familiarity with the layout of the warehouse, the individuals present on the night of the flooding, and the details of the flooding as they unfolded, and accordingly laid the foundation for his elaborate testimony implicating appellants in the fraudulent scheme. Appellants contend, however, that the new evidence would lead a jury to discredit Beyda's testimony because his testimony was inextricably linked to Rishty's testimony. Appellants seek to account (as they must) for the independent corroboration of Beyda's testimony by arguing that Beyda could have learned about the warehouse and flooding from Rishty, who would have acquired those details through his purportedly lawful role as Scrimshaw's public claims adjuster.7

Appellants' argument is unpersuasive. First, the jury did not credit it at trial, even though it heard evidence that Rishty and Beyda had been debriefed together by the government, and had continued to communicate with each other while they were cooperating. The new evidence would not prompt a jury to accept appellants' theory because

_____

6. Appellants argue that the District Court's conclusion was based on an incorrect legal standard insofar as it assessed whether there was sufficient independent evidence to support a conviction, instead of whether the new evidence was likely to create a"reasonable doubt." Appellants' argument is unavailing; we previously have employed an approach focusing on the sufficiency of evidence when reviewing the denial of a motion for a new trial. See Adams , 759 F.2d at 1108 (stating that "other [non-tainted] evidence in the case was more than sufficient to sustain a finding of guilt").

7. At trial, the defense denied Rishty's and Beyda's presence at the warehouse on the night of the flooding, but did not deny that Rishty subsequently had assisted appellants in filing their insurance claim.

Rishty's incriminating conversation with Falack does not suggest that Beyda was falsely implicating people in crimes. In any event, appellants' argument does not account for certain aspects of Beyda's independently corroborated testimony. For example, Beyda correctly testified that a police officer responding to the alarm triggered by the broken sprinkler head had radioed his headquarters, upon arriving at the warehouse, to inform it that there was no fire; there is no indication that Rishty knew of this statement because Rishty was not present during the flooding and would not necessarily have learned of it through his role as a public adjuster. Thus, we conclude that the new evidence did not undermine the strength of Beyda's testimony implicating appellants in the fraudulent insurance scheme. The government also presented other evidence probative of appellants' guilt, such as their financial motive to commit insurance fraud, their false statements to the Chubb investigator, their forging of invoices for merchandise they claimed had been damaged during the staged flooding, and the positioning and design of the sprinkler head, which undermined the strength of their cover story about the cause of the broken sprinkler head. Given this independent evidence of appellants' guilt, and the strength of Beyda's untainted testimony, the District Court's conclusion that the new evidence would not probably produce an acquittal was hardly erroneous.

Because the District Court did not abuse its discretion in concluding that the new evidence failed not only one but two of the necessary requirements for a new trial, we will affirm its decision denying appellants' Rule 33 motion.

III. EVIDENTIARY RULINGS

Appellants challenge the admission of two pieces of evidence at trial: evidence of prior misconduct by Tom Yaccarino, a former judge and vice-president of Scrimshaw at the time of the flooding, and evidence of Isaac's participation in another fraudulent insurance scheme with Rishty. We find error in the admission of thefirst piece of evidence, but conclude that it was harmless. We also conclude that there was no error with respect to the second piece of evidence.

10

A. Evidence of Yaccarino's Prior Misconduct

Appellants contend that the District Court improperly admitted evidence of specific instances of misconduct by Yaccarino to impeach his credibility. The impetus for the admission of this evidence was the prior admission of a statement made by Yaccarino at the time of the water damage. Linda Chewning, a Scrimshaw employee, testified that she was working in the warehouse on the night in question. During cross-examination by defense counsel, she testified that Yaccarino had run into the office kitchen screaming words to the effect of "oh my God, Neil did something stupid, [threw] something, now he has got a mess . . . . I can't believe it. He is so stupid. He threw it. He is stupid, he is dumb." Yaccarino was deceased at the time of trial. The District Court admitted his statement as hearsay under the excited utterance exception in Fed. R. Evid. 803(2).8

_____

8. Rule 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence
to prove the truth of the matter asserted." As this makes clear, not every extrajudicial statement constitutes hearsay. Rather,"[i]f the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of the matter asserted, and the statement is not hearsay." Fed. R. Evid. 801(c) advisory committee's note. Typically known as "verbal acts" (or perhaps more logically as "verbal utterances"), such statements thus give rise to legal consequences independent of their assertive quality. See, e.g., Mueller v. Abdnor, 972 F.2d 931, 937 (8th Cir. 1992); United States v. Cardascia, 951 F.2d 474, 486-87 (2d Cir. 1991); Weinstein's Evidence P 801.03[2] (1999).

Appellants sought to have Yaccarino's statement admitted to prove the truth of the assertion that Neil had accidentally broken the sprinkler head, while the government maintained that his statement was for "show" and merely part of the larger cover story. The excited utterance exception, pursuant to which the District Court admitted Yaccarino's statement, allows admission of a hearsay "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Fed. R. Evid. 803(2). We are doubtful, however, that appellants were entitled to admission of Yaccarino's statement under this exception because case law imposes a requirement that the declarant "personally perceived the event or condition about which the statement is made." United States v. Mitchell, 145 F.3d 572, 576 (3d Cir. 1998) (citing Miller v. Keating, 754

11

Yaccarino's statement was important to appellants' defense because it purportedly provided contemporaneous evidence supporting their claim that Neil accidentally had broken the sprinkler head. Accordingly, the government sought to attack the statement by impeaching Yaccarino's credibility. The government asked the District Court to take judicial notice of two New Jersey Supreme Court decisions ordering Yaccarino's removal from the bench and disbarment for unethical conduct, as well as the factual details supporting those decisions, which reflected his unethical conduct.9 Appellants objected to that evidence on the grounds that the credibility of a hearsay declarant may not be impeached with extrinsic evidence of bad acts, and that the danger of unfair prejudice from this evidence substantially outweighed its probative value. Overruling these objections, the District Court took judicial notice of the two New Jersey Supreme Court decisions and their factual underpinnings. Appellants renew their objections to this evidence, and raise new challenges on the grounds that judicial notice of the facts in the two court opinions was not proper, and that the District Court conveyed an unfavorable assessment of Yaccarino's credibility to the jury in taking such judicial notice.

_____

F.2d 507, 511 (3d Cir. 1985)). The record is bereft of any suggestion that Yaccarino perceived Neil's purported act of throwing a box and accidentally breaking the sprinkler head; to the contrary, it shows that Yaccarino was in Isaac's office when the sprinkler head was broken, and that Neil subsequently ran into the office to inform them of the alleged accident. Nevertheless, despite our skepticism over whether the personal perception requirement was in fact met, for review purposes we defer to the District Court's ruling admitting Yaccarino's statement for the truth of the matter asserted under the excited utterance exception.

9. The extent of Yaccarino's unethical conduct was substantial. Among other things, Yaccarino had attempted to buy real estate that was the subject of litigation before him and, after learning that the property owner had recorded incriminating statements he had made, Yaccarino attempted to persuade the property owner to submit a false affidavit or give false testimony in court which would exonerate him. Yaccarino also failed to disclose his interest in two liquor licenses that he held in violation of New Jersey law. See generally In the Matter of Yaccarino, 101 N.J. 342, 502 A.2d 3 (1985).

Appellants first argue that the judicially noticed evidence was admitted improperly because, although Federal Rule of Evidence 806 provides for the impeachment of a hearsay declarant, it limits that impeachment to "any evidence which would be admissible for [impeachment purposes] . . . if declarant had testified as a witness." Here, the judicially noticed evidence involved specific instances of Yaccarino's misconduct and, as the government acknowledged at trial, constituted extrinsic evidence. Federal Rule of Evidence 608(b) states:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

Appellants argue that if Yaccarino had testified, Rule 608(b) would have prevented the government from introducing extrinsic evidence of his unethical conduct, and would have limited the government to questioning him about that conduct on cross-examination. Thus, appellants argue, judicial notice of the evidence constituted improper impeachment of a hearsay declarant. The government correctly avers that it would have been allowed to inquire into Yaccarino's misconduct on cross-examination if he had testified at trial because Rule 806 allows a party against whom a hearsay statement is admitted to call the declarant as a witness and "to examine the declarant on the statement as if under cross-examination." Because Yaccarino's death foreclosed eliciting the facts of his misconduct in this manner, the government argues that it was entitled to introduce extrinsic evidence of his misconduct. In effect, the government argues that, read in concert, Rules 806 and 608(b) permit the introduction of extrinsic evidence of misconduct when a hearsay declarant is unavailable to testify.

13

Our standard of review is tied to the resolution of the very issue about which the parties disagree -- the interplay of Rules 806 and 608(b). We afford a district court's evidentiary ruling plenary review insofar as it was based on an interpretation of the Federal Rules of Evidence, but review a ruling to admit or exclude evidence, if based on a permissible interpretation of those rules, for an abuse of discretion. See, e.g., United States v. Sokolow, 91 F.3d 396, 402 (3d Cir. 1996); United States v. Console, 13 F.3d 641, 656 (3d Cir. 1993). In this case, the District Court implicitly interpreted Rule 806 to modify Rule 608(b)'s ban on the introduction of extrinsic evidence in the context of a hearsay declarant.10 Accordingly, we must determine whether that interpretation is permissible to ascertain whether the District Court's admission of the evidence should be reviewed for an abuse of discretion.

At the outset, we note that the issue of whether Rule 806 modifies Rule 608(b)'s ban on extrinsic evidence is a matter of first impression in this circuit, and a matter which the majority of our sister courts likewise has not yet addressed. Indeed, there are only two circuit court opinions construing the effect of Rule 806's intersection with Rule 608(b). Those cases are themselves in conflict. In United States v. Friedman, 854 F.2d 535 (2d Cir. 1988), the Second Circuit held that the trial court properly excluded impeachment evidence that a hearsay declarant had lied to the police because that evidence was not probative of the truthfulness of the hearsay statement there at issue. Id. at 569-70. In doing so, however, the court suggested that extrinsic

_____

10. In ruling that the evidence of Yaccarino's misconduct was admissible, the District Judge stated, in part:

> The situation involving former Judge Yaccarino clearly comes within Rule 806 in that his statement has been admitted in evidence, and the question is an attack upon his credibility. Rule 806 says it may
> be attacked by any evidence which would be admissible if former Judge Yaccarino had testified. If former Judge Yaccarino had testified, I would allow the government to cross-examine him with respect to the removal from office, and disbarment under the second sentence of Rule 608(b). Certainly his disbarment and removal from office would relate to his character for truthfulness or untruthfulness.

14

evidence of such misconduct would have been admissible had the misconduct been probative of truthfulness:"[Rule 608(b)] limits such evidence of `specific instances' to cross-examination. Rule 806 applies, of course, when the declarant has not testified and there has by definition been no cross-examination, and resort to extrinsic evidence may be the only means of presenting such evidence to the jury." Id. at 570 n.8. The Second Circuit's position in Friedman conflicts with the District of Columbia Circuit's more recent statement in United States v. White, 116 F.3d 903 (D.C. Cir. 1997). In that case, the district court had allowed defense counsel to cross-examine a police officer about a hearsay declarant's drug use, drug dealing, and prior convictions, but had not allowed defense counsel to impeach the declarant's credibility by asking the officer whether the declarant had ever made false statements on an employment form or disobeyed a court order. Id. at 920. The declarant was unavailable because he had been murdered. Id. at 911. The court of appeals concluded that defense counsel should have been allowed to cross-examine the officer about the declarant's making false statements and disobeying a court order.11 In doing so, the court observed that defense counsel "could not have made reference to any extrinsic proof of those acts" during cross-examination. Id. at 920. Thus, in contrast to the Second Circuit in Friedman, the D.C. Circuit in White took the position that the ban on extrinsic evidence of misconduct applies in the context of hearsay declarants, even when those declarants are unavailable to testify.

We agree with the approach taken by the court in White, and conclude that Rule 806 does not modify Rule 608(b)'s ban on extrinsic evidence of prior bad acts in the context of hearsay declarants, even when those declarants are unavailable to testify. We perceive our holding to be dictated by the plain -- albeit imperfectly meshed-- language of Rules 806 and 608(b). As discussed, Rule 806 allows impeachment of a hearsay declarant only to the

_____

11. The court in White went on to conclude that the district court had not abused its discretion in disallowing the testimony because the testimony would have been of marginal utility given the declarant's already damaged credibility. Id. at 920.

15

extent that impeachment would be permissible had the declarant testified as a witness, which, in the case of specific instances of misconduct, is limited to cross-examination under Rule 608(b). The asserted basis for declining to adhere to the clear thrust of these rules is that the only avenue for using information of prior bad acts to impeach the credibility of a witness -- cross-examination -- is closed if the hearsay declarant cannot be called to testify. We are unpersuaded by this rationale. First, the unavailability of the declarant will not always foreclose using prior misconduct as an impeachment tool because the witness testifying to the hearsay statement may be questioned about the declarant's misconduct -- without reference to extrinsic evidence thereof -- on cross-examination concerning knowledge of the declarant's character for truthfulness or untruthfulness.12 And, even if a hearsay declarant's credibility may not be impeached with evidence of prior misconduct, other avenues for impeaching the hearsay statement remain open. For example, the credibility of the hearsay declarant -- and indeed that of the witness testifying to the hearsay statement-- may be impeached with opinion and reputation evidence of character under Rule 608(a), evidence of criminal convictions under Rule 609, and evidence of prior inconsistent statements under Rule 613. The unavailability of one form of impeachment, under a specific set of circumstances, does not justify overriding the plain language of the Rules of Evidence. Cf. United States v. Finley, 934 F.2d 837, 839 (7th Cir. 1991) ("Rule 806 extends the privilege of impeaching the declarant of a hearsay statement but does not obliterate the rules of evidence that govern how impeachment is to proceed").

_____

12. We recognize the dilemma presented if the witness has no knowledge of the hearsay declarant's misconduct. One solution:firm adherence to the hearsay rules (Rules 801-807) in determining whether a proffered statement truly is admissible in the first instance. It is, of course, not the role of the trial judge to make a credibility determination in a criminal jury trial. Nonetheless, when an out-of-court declaration is offered for the truth of the matter asserted, it becomes "hearsay," subject
to the exclusions in Rule 801(d), and is presumptively inadmissible, subject only to carefully defined exceptions. See Fed. R. Evid. 802-804, 807.

We also read the language of Rule 806 implicitly to reject the asserted rationale for lifting the ban on extrinsic evidence. Rule 806 makes no allowance for the unavailability of a hearsay declarant in the context of impeachment by specific instances of misconduct, but makes such an allowance in the context of impeachment by prior inconsistent statements. Rule 613 requires that a witness be given the opportunity to admit or deny a prior inconsistent statement before extrinsic evidence of that statement may be introduced. If a hearsay declarant does not testify, however, this requirement will not usually be met. Rule 806 cures any problem over the admissibility of a non-testifying declarant's prior inconsistent statement by providing that evidence of the statement "is not subject to any requirement that the declarant may have been afforded an opportunity to deny or explain." See generally Fed. R. Evid. 806 advisory committee's notes. The fact that Rule 806 does not provide a comparable allowance for the unavailability of a hearsay declarant in the context of Rule 608(b)'s ban on extrinsic evidence indicates that the latter's ban on extrinsic evidence applies with equal force in the context of hearsay declarants.

In reaching this conclusion, we are mindful of its consequences. Upholding the ban on extrinsic evidence in the case of a hearsay declarant may require the party against whom the hearsay statement was admitted to call the declarant to testify, even though it was the party's adversary who adduced the statement requiring impeachment in the first place. And, as here, where the declarant is unavailable to testify, the ban prevents using evidence of prior misconduct as a form of impeachment, unless the witness testifying to the hearsay has knowledge of the declarant's misconduct. See generally 4 Mueller & Kirkpatrick, Federal Evidence S 511 at 894 n.7 (2d ed. 1994); Margaret Meriwether Cordray, Evidence Rule 806 and the Problem of Impeaching the Nontestifying Declarant, 56 Ohio St. L.J. 495, 525-530 (1995). Nevertheless, these possible drawbacks may not override the language of Rules 806 and 608(b), and do not outweigh the reason for Rule 608(b)'s ban on extrinsic evidence in the first place, which is "to avoid minitrials on wholly collateral matters which tend to distract and confuse the jury . . . and to prevent

17

unfair surprise arising from false allegations of improper conduct." Carter v. Hewitt, 617 F.2d 961, 971 (3d Cir. 1980) (internal quotations and citation omitted); accord United States v. Martz, 964 F.2d 787, 789 (8th Cir. 1992); Foster v. United States, 282 F.2d 222, 223 (10th Cir. 1960).

From our conclusion that the ban on extrinsic evidence of misconduct applies in the context of hearsay declarants, it follows that the District Court's ruling admitting evidence of Yaccarino's misconduct was based on an incorrect interpretation of Rules 806 and 608(b). We conclude, therefore, that the District Court erred in admitting such evidence. Nevertheless, we find the error to be harmless. An error is harmless if "it is highly probable that the error did not contribute to the judgment." United States v. Gibbs, 190 F.3d 188, 213 n.16 (3d Cir. 1999) (quoting United States v. Mastrangelo, 172 F.3d 288, 297 (3d Cir. 1999)). That standard is met "when the court possesses a `sure conviction' that the error did not prejudice the defendant." Id. The District Court's admission of extrinsic evidence of Yaccarino's misconduct did not prejudice appellants because, at the request of appellants' trial counsel, it also took judicial notice of Yaccarino's obituary to rehabilitate his credibility. The obituary cast Yaccarino in a very favorable light, as it contained salutary comments from two other judges, stated that he had done a lot of charitable work in the years preceding his death, and portrayed him as someone who believed steadfastly in the justice system, but who felt that the system had "let him down." In this last respect, the obituary provided an explanation for Yaccarino's conduct underlying his removal from the bench and his disbarment by describing his belief that his conduct resulted from a temporary mental disability he had suffered after undergoing open heart surgery in 1979. We are confident that the strength of these favorable comments counteracted the effects of the evidence impeaching Yaccarino's credibility.13 We conclude that the admission of Yaccarino's obituary, coupled with the District Court's

_____

13. Isaac's trial counsel acknowledged this point when he stated to the court: "I have no problem admitting the good with the bad. If they want to slam his character, all I want is an attempt to support his character." Although this comment referred more immediately to the mix of favorable and unfavorable comments about Yaccarino in the obituary, it evidenced counsel's belief in the rehabilitative effect of the favorable comments. (It also should be noted that the obituary itself included multiple examples of blatant inadmissible hearsay, but we shall not dwell on that facet of the puzzle.)

instruction to the jury that it could not use evidence of Yaccarino's misconduct to find appellants guilty by association, removed any prejudice to appellants from the court's taking judicial notice of the two New Jersey state court opinions.[14] The District Court's error in admitting the extrinsic impeachment evidence was, therefore, harmless.

Our conclusion as to harmless error renders it unnecessary to address appellants' other two contentions challenging the admission of the impeachment evidence -- that the requirements for taking judicial notice were not satisfied and that the evidence was unduly prejudicial. Thus, all that remains of appellants' challenge to the evidence of Yaccarino's prior misconduct is their objection to the manner in which it was admitted.

Appellants contend that the District Court conveyed an unfavorable impression of Yaccarino's credibility when taking judicial notice of the facts of his misconduct. Specifically, they argue that the trial judge communicated a "personal concern" to the jury that, because Yaccarino was unavailable to be cross-examined, he had to advise it of certain negative facts bearing on Yaccarino's character, leaving the jury with "the clear message that the judge could not allow them to evaluate Yaccarino's statements without his warning . . . ." We review this claim for plain error because appellants did not make such an objection at trial. See Failla v. City of Passaic, 146 F.3d 149, 159 (3d Cir. 1998); United States v. Gambino, 926 F.2d 1355, 1363 n.6 (3d Cir. 1991). Accordingly, we consider whether there was "error" that was "plain" and that affected "substantial rights." United States v. Olano, 507 U.S. 725, 732 (1993). We find no such error here because the fair and neutral approach of the District Court is evident from the overall record. In advising the jury of certain facts regarding Yaccarino's misconduct, the trial judge explained that he was doing so because Yaccarino would have been subject to

_____

14. Our skepticism as to the admissibility of Yaccarino's hearsay statement in the first instance, see supra n. 8, further assures us that appellants suffered no cognizable prejudice from the admission of extrinsic evidence impeaching his character for truthfulness or untruthfulness.

19

cross-examination if he had been alive, and instructed the jury that it was not required to consider those facts or accept them as conclusive. Appellants' claim that the effect of the judge's comments was to communicate a personal concern to the jury as to Yaccarino's credibility is meritless.

B. Evidence of Isaac Saada's Participation in Another Fraudulent Insurance Scheme

Appellants also challenge the District Court's decision admitting Rishty's testimony that Isaac had conspired with him to commit another insurance fraud -- the "Diadem claim" -- shortly after the warehouse flooding. We review the District Court's ruling for an abuse of discretion and will reverse only if it was "clearly contrary to reason and not justified by the evidence." United States v. Balter, 91 F.3d 427, 437 (3d Cir. 1996) (quoting United States v. Bethancourt, 65 F.3d 1074, 1079 (3d Cir. 1995)). That standard is not met here.

Appellants first argue that the government and the trial judge did not properly articulate a basis for admission of Rishty's testimony under Fed. R. Evid. 404(b), which bars evidence of crimes and other bad acts to establish an individual's propensity for such acts "to show action in conformity therewith," because the government only read the "laundry list" of permissible, non-propensity bases under Rule 404(b), which the District Court accepted without analysis. We disagree. At trial, the government did not merely read the list of non-propensity bases under Rule 404(b), but rather explained that the evidence of Isaac's involvement in another fraud was admissible because it showed his intent to defraud, knowledge of the fraudulent nature of the water damage claim, and financial motive to commit insurance fraud, as well as the unlawful nature of his relationship with Rishty -- which rebutted the defense's position that Rishty had served as Scrimshaw's public adjuster in a lawful capacity -- and the absence of any accident. Following that explanation, the District Court indicated that it was admitting the evidence on the bases recited by the government. We conclude that the court properly admitted this evidence under Rule 404(b) and, by

20

referencing the government's position, reflected an adequate basis for its decision.15

Appellants also raise a Rule 403 challenge to the admission of Rishty's testimony on the grounds that it created a danger that the jury would convict Isaac for being a repeat offender who had escaped punishment on another crime, and that this prejudice would spill over onto Neil. As relevant here, Rule 403 states that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . ." Evidence of Isaac's participation in the Diadem claim was highly probative because it rebutted the defense's contention that Rishty's involvement in the Scrimshaw claim was attributed to his purportedly lawful role as a public adjuster by establishing the unlawful nature of his relationship with Isaac. By contrast, the danger of unfair prejudice from the evidence was slight because Rishty already was implicating Isaac in the fraudulent Scrimshaw claim, and there was no evidence of the Diadem claim apart from his testimony; if the jury had been inclined to reject Rishty's testimony as to the Scrimshaw claim, Rishty's testimony as to the Diadem claim certainly would not have dissuaded it from doing so under a belief that Isaac was a repeat offender who should not escape punishment. The District Court's instruction to

_____

15. Appellants' citation to United States v. Murray, 103 F.3d 310 (3d. Cir.
1997), is unavailing. In that case, we stated that trial judges should exercise care in admitting evidence under Rule 404(b) by insisting that the party offering such evidence articulate the basis for its admissibility,
and by explaining the ruling admitting the evidence. Id. at 316; see also United States v. Himmelwright, 42 F.3d 777, 781 (3d Cir. 1994). Here, the government's articulation, and the court's acceptance, of the non-propensity bases for admitting evidence of Isaac's participation in another fraudulent claim satisfy our admonition in Murray.

Consistent with the language of Rule 404(b), virtually all such issues are raised pretrial, and the evidentiary subtleties are discussed other than before the jury. However, often the full context of Rule 404(b) evidence may not be evaluated until all evidence has been presented, following which the jury may be carefully instructed as to the limited way in which the evidence may be considered. See Huddleston v. United States, 485 U.S. 681, 691 (1988); United States v. Jemal, 26 F.3d 1267, 1272 n.2 (3d Cir. 1994).

21

the jury limiting the admission of the evidence to Isaac, and only for the limited purposes set forth by the judge, further minimized the danger of unfair prejudice. Thus, the District Court did not abuse its discretion in concluding that the danger of unfair prejudice did not substantially outweigh the highly probative value of the evidence.

IV. VOUCHING

Appellants contend that the prosecutor improperly vouched for the credibility of Rishty and Beyda during rebuttal argument. Appellants' failure to object to what was said mandates a plain error analysis. See United States v. Walker, 155 F.3d 180, 187-88 (3d Cir. 1998); Bethancourt, 65 F.3d at 1079. Accordingly, we may reverse only if we "find error in the prosecutor's comments so serious as to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice." Walker, 155 F.3d at 188 (internal quotations omitted). That standard is not met here; the prosecutor's arguments were entirely proper.

As we stated recently in Walker, "[v]ouching constitutes an assurance by the prosecuting attorney of the credibility of a Government witness through personal knowledge or by other information outside of the testimony before the jury." Id. at 184. A prosecutor's vouching for the credibility of government witnesses poses two dangers:

> . . . such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.

United States v. Young, 470 U.S. 1, 18-19 (1985); accord United States v. Molina-Guevara, 96 F.3d 698, 704 (3d Cir. 1998). Two criteria must be met in order to find vouching: (1) the prosecutor must assure the jury that the testimony of a government witness is credible, and (2) this assurance must be based on either the prosecutor's personal

22

knowledge or other information not contained in the record. See Walker, 155 F.3d at 187.

The prosecutor did not engage in vouching because he grounded his comments on the evidence presented at trial. Appellants complain that during closing argument, the prosecutor improperly argued that Rishty and Beyda were not lying because (1) the S 5K1.1 motion depended on the government's recommendation; (2) they knew the S 5K1.1 motion required truthful testimony; (3) they would go to prison and possibly be prosecuted for perjury if they did not testify truthfully; and (4) they had plenty of other crimes on which to cooperate, and thus had no need to falsely implicate appellants. Appellants concede that the evidence had established the following: under the terms of their cooperation agreements, Rishty and Beyda were required to testify truthfully; the government would not be required to recommend a reduced sentence if they did not present truthful information; and Rishty had spent some 3,000 hours, and Beyda had spent at least 1,000 hours, cooperating with the government.16 Because the prosecutor's comments as to why Rishty and Beyda had an incentive to tell the truth were based on this evidence, they constituted proper argument and not improper vouching.17

_____

16. Appellants also argue that the District Court erred in admitting this evidence because it improperly bolstered the credibility of Rishty and Beyda. We have approved the admissibility of a plea agreement's provision requiring truthful testimony by a cooperating witness on other occasions, see, e.g., United States v. Ramos, 27 F.3d 65, 67 n.4 (3d Cir. 1994), and have stated that such evidence constitutes permissible rehabilitation where, as here, it is presented in response to, or in reasonable anticipation of, defense counsel's impeachment of the witness' credibility, see United States v. Oxman , 740 F.2d 1298, 1302–03 (3d Cir. 1984), vacated on other grounds, sub nom. United States v. Pflaumer, 473 U.S. 922 (1985). Appellants' bolstering argument lacks merit.

17. The cases cited by appellants, see United States v. DiLoreto, 888 F.2d 996, 999 (3d Cir. 1989), overruled on other grounds, United States v. Zehrbach, 47 F.3d 1252 (3d Cir. 1995) (en banc); United States v. Dispoz-O-Plastics, Inc., 172 F.3d 275, 284 (3d Cir. 1999), are distinguishable; in both cases, the prosecutor's statements were considered improper vouching because they referred to evidence outside the trial record.

23

See Walker, 155 F.3d at 187 (citing United States v. Pungitore, 910 F.2d 1084, 1125 (3d Cir. 1990)).

Appellants argue that the prosecutor's comments and the related evidence at trial implied that the "government had some extra-record knowledge and capacity to monitor the truthfulness of the cooperating witnesses." The prosecutor, however, never suggested that the government's evaluation of the witnesses' testimony would be based on anything other than the testimony at trial. The District Court did not commit any error, much less plain error, in allowing the prosecutor's comments as to Rishty's and Beyda's credibility during rebuttal argument.

V. CONCLUSION

Because we find the District Court's error in admitting extrinsic evidence of a hearsay declarant's prior bad acts to be harmless, because we conclude that the District Court did not err or abuse its discretion in its other challenged rulings, and because the prosecutor's closing argument presented no error, we will affirm the convictions.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit

24