PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

―――――――

No. 09-1667

―――――――

UNITED STATES OF AMERICA

v.

GERMAN QUILES,

Appellant

―――――――

No. 09-1686

―――――――

UNITED STATES OF AMERICA

v.

GLORIA QUILES,

Appellant

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Crim. Nos. 07-391-1 and 07-391-3)
Honorable Jan E. DuBois, District Judge

Argued June 23, 2010

BEFORE: SMITH, FISHER and
GREENBERG, Circuit Judges

(Filed: August 17, 2010)

Jonathan J. Sobel (argued)
Law Offices of Jonathan J. Sobel
1420 Walnut Street, Suite 1420
Philadelphia, PA 19102

    Attorney for Appellant German Quiles

John J. Griffin (argued)
Law Office of John J. Griffin
239 South Camac Street
Philadelphia, PA 19107

    Attorney for Appellant Gloria Quiles

Michael L. Levy
United States Attorney
Robert A. Zauzmer
Assistant United States Attorney,
Chief of Appeals
Andrea G. Foulkes (argued)
Assistant United States Attorney
Frank A. Labor, III
Assistant United States Attorney
Office of the United States Attorney
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106

      Attorneys for Appellee

---

OPINION OF THE COURT

---

GREENBERG, Circuit Judge.

## I. INTRODUCTION

This matter comes on before this Court on appeal from judgments of conviction and sentence entered against two defendants in the District Court in which the government's case relied heavily on the testimony of an undercover informant. After the jury found defendants guilty at the trial, a state grand jury indicted the informant in an unrelated matter on charges of child rape and other heinous sexual

crimes. Once defendants learned about the informant's indictment, they sought a new trial under Fed. R. Crim. P. 33. The District Court denied their request and they now appeal to this Court. For the reasons we give in this opinion, we will affirm the District Court's order denying the motions for a new trial. We also reject defendants' individual challenges to the sufficiency of the evidence, the procedure used in sentencing, and the substantive sentence imposed.

## II. BACKGROUND

German Quiles and Maria Quiles, husband and wife, owned Aruba, Inc., a money-servicing business operating as "Aruba Check Cashing and Auto Tags" in North Philadelphia.[1] Their daughter Gloria Quiles also worked at Aruba Check Cashing and served as the company's secretary. The company offered services such as money wires, money orders, and check cashing. The business was subject to federal regulations relating to money laundering with German Quiles being responsible for its compliance with these regulations.

## A. The Government's Investigation

---

[1] German Quiles was the president of the company and Maria Quiles was its co-president. Gloria and German Quiles were co-owners of the property.

In July of 2006, the government began an investigation into possible money laundering at Aruba Check Cashing. Immigration and Customs Enforcement Special Agent Steven Galambos, who relied on an undercover informant named Hector Ayala, led the investigation. Galambos instructed Ayala to enter Aruba Check Cashing and identify himself as a drug dealer's assistant who needed money laundered, making sure to ask for the name of the employee assisting him. For each visit, Galambos gave Ayala a bag full of small bills and told Ayala to request large bills, money orders, and wire transfers. Ayala could offer up to 10% of the money that Aruba was laundering as a "fee" in exchange for the laundering. After he exited the store, Ayala told Galambos what occurred, and Ayala's recitation would be confirmed by a recording device that Galambos had concealed inside Ayala's jacket or pants pocket. Ayala turned over the newly laundered bills, money orders, and wire transfer receipts to Galambos.

Operating under Galambos's instructions, Ayala entered Aruba Check Cashing as a confidential informant 30 different times.[2] On his first visit Ayala explained his criminal purpose, and on the remaining visits he brought money for laundering or picked up laundered money. Ayala reported that German Quiles, Maria Quiles, and Gloria Quiles

---

[2]Some transactions took multiple visits to complete. The government charged 16 independent acts of money laundering between September 20, 2006, and January 12, 2007. The parties laundered several thousand dollars during each transaction for a total of $175,900.

all performed money laundering transactions for him while knowing that they were helping to launder drug money. Ayala also reported that the Quileses accepted "fees" well above normal for the type of transactions involved in their services.[3]  When Ayala delivered the laundered money to Galambos he gave him a summary of the events that occurred in Aruba Check Cashing.  Unfortunately, Ayala's recollection is the best evidence of what had taken place inside Aruba Check Cashing as the recordings produced from the hidden recording device are of extremely poor quality and entire sections of them in some instances are inaudible.  However, there are some audible incriminating statements on the tapes. E.g., Supp. App. 75 (Ayala states that he has "drug money"); id. at 68 (man Ayala identifies as German Quiles asks if Ayala wants "money laundry, money" [sic]).[4]

## B.  Trial and Conviction

---

[3]The District Court in its opinion denying defendants' motions for an acquittal stated that "Ayala was paying defendants extraordinary fees.  A typical customer at Aruba paid no more than $.99 per money order, but Ayala was paying hundreds of dollars for the same service." United States v. Quiles, No. 07-391, 2008 WL 3561618, at *9 (E.D. Pa. Aug. 13, 2008) (citations to trial transcript omitted).

[4]The conversations were in Spanish but were translated to English for the jury.

After the government concluded its investigation, a grand jury charged German Quiles, Maria Quiles, and Gloria Quiles with conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h) (Count One) and 16 separate acts of money laundering or aiding and abetting money laundering in violation of 18 U.S.C. §§ 2, 1956(a)(3) (Counts Two through Seventeen). Defendants pled not guilty and the case proceeded to a jury trial.

At trial, the government's case rested primarily on the testimony of three witnesses. The first witness, IRS employee Ted Cunningham, explained the money laundering requirements that applied to Aruba Check Cashing. Galambos was the second witness and he recounted the details of his investigation and his interactions with the undercover informant. Galambos, however, could not testify about most of what had occurred inside of Aruba Check Cashing because he remained outside the business during Ayala's excursions. The government called Ayala as the third of these witnesses. Ayala described his actions and gave a step-by-step analysis of the events that his hidden device recorded. For example, Ayala explained where he was standing in the store and identified the voices heard on the recordings. He also testified to non-verbal actions that defendants took, such as smiling or nodding, and to unrecorded conversations such as his introduction to German Quiles at which Ayala explained that he was there to launder drug money.

It is obvious that Ayala's testimony was essential to the government's case. Without his explanations, the secret recordings would have been barely usable snippets of sounds

and partial conversations. Understandably, therefore, defendants built their strategy around discrediting Ayala. Thus, in his opening statement, the attorney for German Quiles told the jury they would see an informant "run amok," by accusing innocent people in order to get paid. App. at 260. The government, in contrast, stated that Ayala had worked as a confidential informant for over 20 years, doing "good, old fashioned" undercover work. Id. at 252. The trial focused on this chasm.

The jury returned its verdict on January 17, 2008, convicting German Quiles and Maria Quiles on all the counts charged. The jury, however, found Gloria Quiles not guilty of conspiracy to commit money laundering (Count One) and of ten specific acts of money laundering (Counts Two through Eleven). But it convicted her of the remaining six specific acts of money laundering (Counts Twelve through Seventeen). Defendants moved for a judgment of acquittal or a new trial but the District Court denied their requests on August 13, 2008, in an order entered on August 14, 2008. United States v. Quiles, No. 07-391, 2008 WL 3561618 (E.D. Pa. Aug. 13, 2008).

### C. Post-Trial Events

Soon after the District Court denied defendants' post-trial motions for acquittal or a new trial, a grand jury in Pennsylvania indicted Ayala on multiple counts of statutory sexual assault, involuntary deviate sexual intercourse with a minor under the age of 13 years, and other similar crimes.

8

After learning of Ayala's indictment, all three defendants moved for a new trial under Fed. R. Crim. P. 33.[5] On February 24, 2009, the District Court denied defendants' motions in an order entered on February 25, 2009, holding that the new evidence was inadmissible impeachment evidence. United States v. Quiles, No. 07-391, 2009 WL 466283, at *5 (E.D. Pa. Feb. 24, 2009).

The District Court then sentenced defendants. The Court calculated a guideline sentence for German Quiles of 78 to 97 months based on a guideline offense level of 28 and a criminal history category of I. German Quiles, however, requested leniency, contending that he had led an exemplary life, worked for many years, served in the national guard and in public office, and was 70 years old and infirm. The government, in contrast, emphasized that money laundering is necessary for drug dealing to survive, a fact German Quiles apparently understood. On February 25, 2009, the District Court sentenced German Quiles to a custodial term of 60 months to be followed by three years of supervised release and it imposed a $100,000 fine on him. The Court subsequently sentenced both Maria Quiles and Gloria Quiles to terms of five years on probation with six months of home confinement.[6]

---

[5]Maria Quiles filed the motion and the other defendants joined in it.

[6]Inasmuch as Maria Quiles and Gloria Quiles or for that matter the government did not appeal from their sentences, we will not discuss their sentencings any further. In fact, Maria Quiles did

9

German Quiles and Gloria Quiles now appeal to this Court asking us to reverse the District Court's order of February 24, 2009, denying their Rule 33 motions for a new trial. In addition, Gloria Quiles argues that the evidence was not sufficient for her conviction and asks us to reverse the District Court's order of August 13, 2008, denying her motion for a judgment of acquittal. Finally, German Quiles argues that the sentence the Court imposed on him on February 25, 2009, was procedurally and substantively unreasonable. We now will refer to German Quiles and Gloria Quiles as "appellants," excluding Maria Quiles who has not appealed.

## III. JURISDICTION

The District Court had jurisdiction because the indictments charged violations of federal criminal law. 18 U.S.C. § 3231. We have jurisdiction because appellants filed timely notices of appeal after their conviction and sentencing. 28 U.S.C. § 1291; 18 U.S.C. § 3742(a).

## IV. DISCUSSION AND ANALYSIS

### A. The Interest of Justice Does Not Require a New Trial

---

not appeal at all.

Rule 33 provides that a district court "may vacate any judgment and grant a new trial if the interest of justice so requires." There are five requirements that must be met before a court may grant a new trial on the basis of newly discovered evidence:

> (a) the evidence must be in fact newly discovered, i.e. discovered since trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

United States v. Saada, 212 F.3d 210, 216 (3d Cir. 2000) (quoting Government of the Virgin Islands v. Lima, 774 F.2d 1245, 1250 (3d Cir. 1985)).

When the District Court denied appellants' motions for a new trial on February 24, 2009, it gave two reasons for its decision. First, the Court said that the newly discovered evidence regarding Ayala would not produce an acquittal during a new trial because it would not be admissible.[7] When

---

[7]In a sense the new evidence to the extent that it was the returning of the indictment against Ayala was not newly discovered. Rather, it was newly created. See Saada, 212 F.3d at 216. Nevertheless, we will treat it as though it was newly

11

the Court made its ruling, Ayala had not been convicted of his crimes and the evidence likely would have proven too inflammatory to be admitted. <u>See</u> Fed. R. Evid. 609 (impeachment of witness allowed using evidence of <u>conviction</u> of crime) (emphasis added); Fed. R. Evid. 403 (evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice). Second, the Court said that the newly discovered evidence was mere impeachment evidence and thus could not form the basis for granting a new trial "under the plain language of <u>Saada</u>." <u>Quiles</u>, 2009 WL 466283, at *4.[8] At the same time, the Court distinguished a case in which another court granted a new trial solely on the basis of impeachment evidence. <u>See</u> <u>United States v. Lipowski</u>, 423 F. Supp. 864 (D.N.J. 1976). When distinguishing <u>Lipowski</u>, the Court noted that arguably <u>Lipowski</u> may no longer be good law in light of <u>Saada</u>.

------

discovered.

[8]Appellants contend that the District Court erred in not conducting an evidentiary hearing on their motions. But we reject this contention as they did not request such a hearing in the District Court and even if they had they would not have been entitled to it as the Court adjudicated the matter on bases not requiring resolution of a factual dispute at an evidentiary hearing. In any event, even now we see no issue that an evidentiary hearing could have resolved as we are deciding the case on the basis of a set of facts that treats Ayala as having committed and having been convicted of the sexual offenses for which the state charged him.

12

We think that we should focus on the District Court's second reason for denying the new trial because its first reason has lost some of its persuasive power inasmuch as five months after the District Court issued its February 24, 2009 opinion denying a new trial, a state jury convicted Ayala of the offenses charged against him.[9] Convictions, unlike indictments, may be admissible under Federal Rule of Evidence 609, and the bare fact of a conviction is normally not so inflammatory that it should be excluded under Fed. R. Evid. 403. Moreover, we see no reason why after Ayala's state conviction appellants could not have filed new Rule 33 motions in the District Court seeking a new trial though they did not do so.[10] Thus, we will focus on the permanent, not transient, features of the Court's decision.[11]

---

[9]Of course, we realize that the District Court ruled on the basis of the facts at the time of its decision denying the new trial motions as it did not have a crystal ball and thus could not foresee the outcome of the state proceedings. It is significant that the state court trial at which the jury convicted Ayala took place after appellants were convicted and sentenced and had appealed to this Court. The appeal terminated the District Court's jurisdiction to consider a new trial motion. See Fed. R. Crim. P. 33(b)(1).

[10]After appellants appealed Rule 33(b)(1) would have required them to move for a remand in this Court to the District Court to file new Rule 33 motions.

[11]The District Court jury returned the verdict on January 17, 2008, and it therefore appears that the three-year window for a

13

1.      Standard of Review

        A determination of whether it should grant a new trial is left to the discretion of a district court.  United States v. Cimera, 459 F.3d 452, 458 (3d Cir. 2006).  Accordingly, we normally review a district court's determination of a new trial motion under the deferential "abuse of discretion" standard.  United States v. Brown, 595 F.3d 498, 511 (3d Cir. 2010) ("We will reverse a denial of a Rule 33 motion for a new trial based on newly discovered evidence only if we conclude that the district court abused its discretion in denying the motion.").  At certain points, however, the District Court suggested that it was bound as a matter of law to deny appellants' Rule 33 motions.  See Quiles, 2009 WL 466283, at **2, 4 (noting the "requirements" of Saada and then denying defendants' motions because "the plain language" of Saada required it to do so).  Also, when ruling on a later motion to stay appellants' sentences pending appeal, the District Court referred to its earlier Rule 33 decision and stated, "[t]he Court's exercise of discretion . . . in ruling on the defendant's Rule 33 Motion, was cabined by controlling precedent—the Federal Rules of Evidence and Third Circuit case law."  United States v. Quiles, No. 07-391, 2009 WL 764306, *5 (E.D. Pa. Mar. 23, 2009).  To the extent that we are reviewing a legal rather than discretionary decision of the District Court, we will apply a de novo standard of review.

---

new trial motion under Rule 33(b)(1) is still open.  We, however, do not say definitively that it is open as none of the defendants have filed another motion for a new trial and there might be other procedural bars to such a motion.

14

But the distinction between the two standards of review makes no difference on this appeal because we would affirm the District Court exercising complete de novo review.

2.      The Evidence Relied on Must Not Be Merely Cumulative or Impeaching

Appellants say that they are not relying on mere impeachment evidence in seeking a new trial and thus our opinion in Saada that we quote above does not require that we deny them a new trial. Rather, they point out that when the government hired Ayala as a confidential informant he signed several statements acknowledging limitations on his conduct, including one reciting that he was "not permitted to violate any laws." Supp. App. 1536–43.[12] Appellants say that Ayala's false written pledge not to commit any crimes, combined with his commission of serious crimes, demonstrate that there was a sufficient basis for granting a new trial.[13]

---

[12]The government introduced this signed statement at trial when explaining the procedure for employing a confidential informant. (Of course, the statement also served to bolster Ayala's credibility.) The government asked Ayala a few questions about the statement, but did not spend much time addressing it.

[13]We do not understand why we should categorize the agreement as false merely because Ayala did not live up to his obligations under it. To the contrary, it would seem that to show that an agreement was false a party making that claim would have to demonstrate that the person making the agreement intended to violate it when he made it.

15

Appellants admit that their new evidence could be classified as impeachment evidence, but they assert that they nevertheless are entitled to a new trial because the new evidence "goes to the foundation of the government's case." Appellant Gloria Quiles's br. at 43–44.

We agree with appellants that in certain unusual circumstances a court should not deny a new trial that a defendant seeks on the basis of newly discovered evidence merely because the evidence is impeaching in character. In stating our limited agreement with appellants we observe that Rule 33(a) as written permits courts to grant a new trial when the interest of justice requires it and does not distinguish between newly discovered circumstantial and direct evidence as a basis for granting such a motion. Yet we recognize that notwithstanding Rule 33's language, there are opinions that say that a court should not grant a motion for a new trial on mere impeachment evidence. But these cases do not seem to give enough significance to the wording of Rule 33 which, as we have indicated, makes clear that the interest of justice guides the courts on deciding Rule 33 motions and does not suggest that a court should distinguish between impeachment and direct evidence in making that determination.

---

Though we recognize that Ayala may have had that very intent, we are not aware of any evidence in the record supporting a conclusion that he intended to do so other than his actual conduct. Moreover, Ayala's commission of crimes before the execution of the agreement would not have made the agreement false as his agreement not to violate any laws was prospective in nature. But we will not linger on that point and instead will accept appellants' characterization of the agreement as false.

16

Accordingly, it is not surprising to find that the court in United States v. Taglia, 922 F.2d 413 (7th Cir. 1991), indicated that the statements that a new trial should not be granted on the basis of newly discovered impeachment evidence cannot

> be taken at face value. Nothing in the text or history of Rule 33 . . . supports a categorical distinction between types of evidence; and we cannot see the sense of such a distinction. If the government's case rested entirely on the uncorroborated testimony of a single witness who was discovered after trial to be utterly unworthy of being believed because he had lied consistently in a string of previous cases, the district judge would have the power to grant a new trial in order to prevent an innocent person from being convicted. The 'interest of justice,' the operative term in Rule 33, would require no less . . .

> The judicial language that seems to exclude impeaching testimony from the scope of Rule 33 thus illustrates the tendency to overgeneralize. It is easy to confuse a practice with a rule. The practice has been to deny new trials where the only newly discovered evidence was impeaching. But the practice should not be taken to imply a rule that even if the defendant proves that his conviction almost certainly rests on a lie, the district judge is helpless to grant a new trial. District judges do not in fact consider

17

themselves helpless in such circumstances, and
they are right not to.

Id. at 415–16.

We agree with this statement from Taglia and we do
not believe that Saada requires us to reject it. District courts
do not and should not ignore a claim that there has been a
miscarriage of justice just because the newly discovered
evidence supporting the claim could be categorized as
impeachment in character. Taglia is not alone in recognizing
this point. E.g., United States v. Davis, 960 F.2d 820, 825
(9th Cir. 1992) ("In some situations . . . the newly-discovered
impeachment evidence may be so powerful that, if it were to
be believed by the trier of fact, it could render the witness'
testimony totally incredible."); United States v. Leary, 378 F.
Supp. 2d 482, 492 (D. Del. 2005) ("[T]here is precedent
indicating that impeachment evidence alone may sometimes
be a basis for a new trial."); Lipowski, 423 F. Supp. at 868-69
(granting new trial after discovering key witness was
untruthful in closely related matters).

At the same time long experience has shown that
newly discovered evidence that is merely impeaching is
unlikely to reveal that there has been a miscarriage of justice.
There must be something more, i.e. a factual link between the
heart of the witness's testimony at trial and the new evidence.
This link must suggest directly that the defendant was
convicted wrongly. See Saada, 212 F.3d at 216 (describing
this link as a necessary "exculpatory connection"). When this
connection is not present, then the new evidence is merely

18

impeaching and its revelation does not warrant granting a new trial.[14]

When asked to grant a new trial solely on the basis of new impeachment evidence, a court carefully should examine whether the defendant has demonstrated the necessary exculpatory connection between the evidence and the offense or has demonstrated that the newly discovered evidence totally undermined critical inculpatory evidence. And courts, in practice, have done so. In Lipowski, the prosecution relied on several tape recordings that the primary government witness had made. After the trial, it was discovered that the witness, in effect, had manufactured a tape recording that threatened him and that he intended the threats to be attributed to an unknown person. While this evidence did not prove that the defendants had been convicted wrongly, and in any event was not used at the trial, the court found it had "serious implications regarding the truth and veracity of [the witness's] testimony" and the evidence "casts serious doubt over the

_____

[14]If a witness at the trial gave a physical description of the criminal that matched the defendant but newly discovered evidence from other persons who saw the crime gave a completely different description of the same criminal, there would be an exculpatory connection between the new evidence and the charge. Of course, the mere presence of that connection would not compel a court to grant a motion for a new trial, as, among other bases for denying the motion, the court might regard the new evidence as unreliable or might believe that other evidence of the defendant's guilt should lead it to deny the motion.

authenticity of the tapes introduced into evidence." Lipowski, 423 F. Supp. at 867-68.

Similarly, in Taglia the key government witness was an FBI informant. After the jury convicted the defendants, it was discovered that the informant had given false testimony in an earlier case. The court of appeals in limiting earlier cases indicating that a new trial cannot be granted on the basis of newly discovered impeachment evidence, stated that a trial court has discretion to grant a new trial when it is shown that the witness "lied consistently in a string of previous cases." Taglia, 922 F.2d at 415. And in Davis, a jury convicted the defendants on drug charges in part on the basis of testimony of an undercover police officer. Some months later the same officer was convicted of stealing drug money that the government had confiscated as evidence. The court in Davis said that "[i]f newly-discovered evidence establishes that a defendant in a narcotics case has been convicted solely on the uncorroborated testimony of a crooked cop involved in stealing drug money, the 'interest of justice' would support a new trial under Rule 33." Davis, 960 F.2d at 825.[15]

In each of the cases that we have described, the courts focused on what we believe was the correct question: was there a strong exculpatory connection between the newly discovered evidence and the facts that were presented at trial or did the newly discovered evidence strongly demonstrate that critical evidence at the trial against the defendant was

[15]In both Taglia and Davis, however, the courts of appeals found other reasons to affirm the convictions.

20

very likely to have been false?  Of course, these standards must be applied strictly and are not easily satisfied.  In Lipowski, the new evidence strongly suggested that the conviction was based on fabricated evidence.  In Taglia, the new evidence showed that a key witness routinely committed perjury when testifying as an informant, and because the witness had testified in that capacity at the defendants' trials, there was great reason to doubt the validity of the convictions.  And in Davis, the new evidence showed that the primary witness was a "crooked cop" who had been caught tampering with (in fact, stealing) evidence.

The facts in these three cases can be contrasted with those in Saada.  In Saada, a witness named Rishty agreed to testify for the government pursuant to a cooperation agreement.  Rishty later was caught on tape advising a friend to give false testimony in exchange for a reduced sentence.  Obviously, this new information cast doubt on Rishty's testimony.  If he had been willing to advise a friend to give false testimony in exchange for leniency, would he not take his own advice?  Nonetheless, we found that the new evidence offered in Saada was "only" impeaching, because there was "no exculpatory connection" between the new evidence and defendants' criminal acts.  212 F.3d at 216.  Even though the new evidence greatly undermined Rishty's credibility, we felt that the exculpatory connection between Rishty's testimony and his advice to a friend in an unrelated case was too tenuous to require granting a new trial.

We do not cite the preceding examples in an attempt to define the exact "exculpatory connection" required.[16] We simply are emphasizing the question to be asked: is there a strong exculpatory connection between the newly discovered evidence and the evidence presented at trial or does the newly discovered evidence, though not in itself exculpatory, throw severe doubt on the truthfulness of the critical inculpatory evidence that had been introduced at the trial. If the answer is affirmative, then a defendant may be entitled to a new trial even though he relies on evidence that could be classified as "impeachment evidence." If the answer is negative, then the defendant is relying on <u>mere</u> impeachment evidence and will not be entitled to a new trial on its basis. Determining the strength and importance of the exculpatory connection or the significance of the newly discovered evidence with respect to the credibility of critical evidence given at the trial is a difficult task that is left in the first instance to the discretion of the district court.

In considering <u>Saada</u> we observe that we could not have intended to hold that evidence germane only for impeachment purposes never could be the basis for granting a

---

[16]Indeed, there may be some tension between <u>Saada</u> and the other cases. A reasonable person could say that the newly discovered evidence in <u>Saada</u> was more damaging to the government's case than the newly discovered evidence in <u>Davis</u> and <u>Taglia</u>. Of course, under our practice <u>Saada</u> sets forth the controlling law in this Court. Third Circuit Internal Operating Procedure 9.1.

new trial.[17]   In this regard, we posit the hypothetical of a defendant discovering after a trial that the sole eye witness at the trial who testified that the defendant committed the crime was beyond any doubt in prison miles from the place of the crime at the time of its commission.[18]   We think that depending on what other evidence had been introduced at trial, it would be reasonable to hold that Rule 33 would authorize a trial court to grant a new trial in that situation even though the newly discovered evidence in no way supported the defendant's claim of being innocent and thus there was no

_____

[17]We note that the government in effect acknowledges that our view of Saada is correct because in its brief it recites that "[w]hile this Court has not addressed this express issue, other circuit courts have recognized that newly discovered impeachment evidence may warrant a new trial in exceptional circumstances." Appellee's br. at 43 n.22.

[18]In point of fact the jury never would hear that the evidence that the ersatz witness had been in prison at the time of the crime because once the government learned that he had been there it would not call on him to testify at a retrial. For that very reason it is fair to say that, depending on what the other evidence was of the defendant's guilt, that the evidence of the witness's incarceration, though not introduced at a retrial, probably would produce an acquittal at that trial as it would eliminate the eye witness testimony of the defendant's guilt.

23

exculpatory connection between the evidence and the facts at trial.[19]

### 3.    The New Evidence Offered in This Case Is Merely Impeaching

In the District Court, appellants argued that the jury never would have believed Ayala if it had known he was a convicted child rapist. <u>See</u> <u>Mills v. Estelle</u>, 552 F.2d 119, 120 (5th Cir. 1977) (convictions show that the witness is unlikely to have the normal witness's respect for the necessity of

---

[19]In this opinion, we have distinguished <u>mere</u> impeachment evidence from evidence supporting the grant of a new trial using a two-part question: is there an exculpatory connection between the new evidence and the charge against the defendant <u>or</u> does the new evidence destroy critical trial evidence?  We include this hypothetical to explain the second half of that question.  The newly discovered evidence in the hypothetical, devastating as it would be, would not have an "exculpatory connection" to the charge against the defendant and would not support an inference that the defendant was not guilty of the charge against him.  <u>See</u> <u>Saada</u>, 212 F.3d at 216.  Yet, clearly, the interest of justice suggests that a new trial should be granted.  Of course, we are not implying that in our hypothetical the court would be compelled to grant a new trial and would abuse its discretion if it did not do so.  In this regard, we point out that there might have been evidence other than eye witness evidence of the defendant's guilt justifying the conviction.

24

giving truthful testimony because of his obvious disrespect of the law).  Appellants' argument made it clear that their newly discovered evidence was mere impeachment evidence and thus, by definition, it is not a sufficient basis for a new trial.

In their appellate briefs and at oral argument, appellants wisely attempt to focus on the negative effect that the new evidence has on Ayala's credibility and, therefore, on his  critical testimony.[20]  Appellants now argue that Ayala repeatedly lied to the government while acting as a confidential informant because he repeatedly but falsely pledged not to commit any crimes.  In appellants' view, this case is similar to Taglia, where a witness was shown to be a serial liar when testifying in a certain capacity.

Notwithstanding appellants' arguments, we find that critical evidence has not been so severely weakened as to justify granting a new trial.  Ayala has testified as a confidential informant in three other cases.  If it was shown that he committed blatant perjury in these other cases then there might be reason to doubt his testimony in this case.  Instead, appellants simply have shown that Ayala committed crimes while working for the government, something he

---

[20]Appellants acknowledged at oral argument that the focus of their argument has changed somewhat as more facts have developed.  Now they focus less on Ayala's bad character (as shown by his heinous acts) and more on his direct history of lying to the government.  However, appellants did cite Lipowski before the District Court, so they raised their argument sufficiently to preserve it so that we can address it.

25

promised not to do.  This is too narrow a basis for granting a new trial because a person signing a government agreement and then violating its terms has engaged in a course of conduct wholly different from that of a person fabricating testimony.  A showing that Ayala violated the terms of his employment is not a sufficient basis to suggest that his entire work as a confidential informant was a sham.  Ayala's treatment of a young girl in violation of his terms of employment, upsetting as it may be, has nothing to do with the conversations that occurred inside Aruba Check Cashing.  See Quiles, 2009 WL 466283, at *5 ("[T]he crimes with which Ayala is charged have absolutely no relation to his role in the investigation or trial of defendants.").  This case involves evidence different from the type of evidence we discussed above regarding the imprisoned witness for the evidence at issue here simply does not establish that Ayala necessarily was untruthful at the trial in this case.

4.      Conclusion on the Rule 33 Issue

Appellants are not entitled to a new trial merely because the principal witness adverse to them has turned out to be a vile person.  A practice supporting the granting of a new trial when such a post-trial showing is made would not be workable.  How bad would the witness's unrelated conduct have to be before a new trial should be granted?  What if Ayala had been stealing cars instead of raping children?  For this reason, appellants here and defendants generally are not entitled to a new trial solely on the basis of newly discovered impeachment evidence.  However, if there is a strong

26

exculpatory connection between the newly discovered impeachment evidence and the charge against the defendant, or if the new evidence totally undermines critical evidence of the defendant's guilt, then the newly discovered impeachment evidence can serve as the basis for a new trial. But impeachment evidence which lacks this connection — evidence that is merely impeaching without an exculpatory connection with respect to the charge against the defendant or without undermining critical inculpatory evidence — will not suffice. Whether our standard of review is de novo or abuse of discretion, the evidence in this case is merely impeaching. Therefore, the District Court correctly denied appellants' motion for a new trial.

### B.   There Was Sufficient Evidence to Convict Gloria Quiles

When evaluating a challenge to a jury's verdict, we apply a particularly deferential standard of review. United States v. Dent, 149 F.3d 180, 187 (3d Cir. 1998). We do not re-weigh the evidence or assess the credibility of witnesses. Id. (citing United States v. Voigt, 89 F.3d 1050, 1080 (3d Cir. 1996)). Instead, we view the evidence in the light most favorable to the government before deciding whether any rational trier of fact could have found the presence of the essential elements of the crime beyond a reasonable doubt. Id. (citing United States v. Thomas, 114 F.3d 403, 405 (3d Cir. 1997)). In this case, our standard of review requires that we view Ayala as a credible witness.

Inasmuch as the jury acquitted Gloria Quiles on the conspiracy charge (Count One) we examine evidence of her personal involvement in every transaction of which she was convicted. The evidence shows that Ayala spoke with Gloria Quiles on October 19, 2006, and on December 6, 2006. On both occasions, Ayala told Gloria Quiles that he was there to launder drug money. For reasons that we do not know the jury did not convict Gloria Quiles with respect to the charges arising from the October conversation, but it nevertheless convicted her of the six acts of money laundering occurring on or after December 6, 2006 (Counts Twelve through Seventeen). After December 6, Gloria knew Ayala's purpose and therefore the assistance she provided was sufficient to convict her of aiding and abetting money laundering. See United States v. Frorup, 963 F.2d 41 (3d Cir. 1992) (affirming conviction of friend who arranged drug deal, even though friend was neither buyer nor seller).

The audio tapes confirm that Gloria Quiles was present for transactions with Ayala on December 6 (Count Twelve), December 7 (Count Thirteen), December 8 (Count Fourteen), January 11 (Count Sixteen), and January 12 (Count Seventeen). Although her interaction with Ayala may have been minimal on some of these days, she knew Ayala was laundering drug money and, by processing his transactions, she was helping the venture to succeed and was participating in it. See United States v. Moses, 220 F.2d 166, 169 (3d Cir. 1955) ("In order to aid and abet another to commit a crime it is necessary that a defendant in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed.") (quoting Nye & Nissen v. United States, 336 U.S.

28

613, 619, 69 S.Ct. 766, 769-70 (1949)) (internal quote omitted).

The government acknowledges that on two of these occasions Gloria Quiles told Ayala that he had to return later if he wanted to complete his transaction. When Ayala did return, someone else completed the money laundering transaction. However, because Gloria Quiles knew that Ayala was there to launder money, her admonition to Ayala to return later was sufficient to support her conviction for aiding and abetting. In short, she knew what Ayala was doing and sought by her actions to help him succeed. On those days when Gloria Quiles performed the transactions herself, she structured them to avoid money laundering requirements.

With respect to the transaction on January 10 (Count Fifteen) the evidence suggested that Gloria Quiles was at Aruba Check Cashing, but did not interact with Ayala that day. However, Ayala was unable to complete the transaction that day and had to return the next day. When Ayala returned, Gloria Quiles spoke to him about the money he had left the previous day. This conduct was sufficient to show that she had involved herself in the January 10 transaction after Ayala departed.[21]

We see no basis to conclude that a reasonable juror could not have voted to convict Gloria Quiles on the facts

[21]Judge Smith believes that the evidence is insufficient to support the conviction of Gloria Quiles on Count 15, and he therefore dissents from this portion of the opinion only.

presented at trial. Viewing the evidence in the light most favorable to the government, we cannot overturn the jury's verdict. Thus, we will affirm Gloria Quiles's conviction in full.

## C. German Quiles's Sentence Was Reasonable

German Quiles challenges the procedure used to arrive at his sentence. He argues that the Court failed to consider evidence suggesting that a lower sentence would have been appropriate and failed to justify the sentence that it imposed. See 18 U.S.C. § 3553(c) (court should state the reasons for its imposition of a particular sentence). But the record demonstrates that the Court was involved closely at every stage of the trial and sentencing. The Court heard sentencing arguments from German Quiles and from the government. The Court then explained at some length why German Quiles was being sentenced to 60 months imprisonment. A sentencing court need not analyze explicitly every argument that a defendant puts forward. See Rita v. United States, 551 U.S. 338, 356, 127 S.Ct. 2456, 2468 (2007) (sentencing court's terse statement of reasons was sufficient explanation of sentence). The Court clearly performed its duties in this case, and did not make a procedural error in doing so.

Next, German Quiles argues that the District Court failed to explain why he was sentenced to prison while his

wife and daughter were not.[22]  He argues that the Court was required to address this issue explicitly under 18 U.S.C. § 3553(a)(6).  But that statute does not contain such an "explicit" explanation requirement, and we already have stated that the Court sufficiently explained the sentence that was imposed.  Additionally, a defendant does not have a right to be sentenced equally with his co-defendants.  See United States v. Parker, 462 F.3d 273, 277–78 (3d Cir. 2006).  Sentencing is an individual matter.  Finally, the record makes clear that the Court saw German Quiles as the ringleader of the criminal activity.  He was the president of Aruba, Inc. and was in charge of its compliance with the applicable regulations with respect to money laundering.  The Court increased his offense level by two because the Court found that he was the leader, manager, or supervisor of the criminal activity at issue.  Supp. App. 1582.  During sentencing, the Court asked German Quiles "why did you involve your wife and daughter?"  Supp. App. 1618.  We see no error here.

German Quiles also challenges his sentence as substantively excessive.  When a district court imposes a sentence after a procedurally sound review, a court of appeals will consider the sentence imposed under an abuse of discretion standard.  Gall v. United States, 552 U.S. 38, 51, 128 S.Ct. 586, 597 (2007).  We cannot say that German Quiles's below-guideline sentence was beyond the discretion of the District Court here.

---

[22]German Quiles does not challenge the amount of the fine.  Of course, he does not argue that the District Court should have imposed longer sentences on his wife and daughter.

31

## V.  CONCLUSION

We have considered whether newly discovered impeachment evidence, standing alone, can be the basis for a new criminal trial, assuming all the other requirements of Rule 33 are met.  We have concluded that it can be in situations in which the evidence is more than merely impeaching or in which it severely undermines the credibility of a crucial government witness whose testimony was essential to the government's case.  Thus, there must be an exculpatory connection between the new impeachment evidence and the witness's testimony at trial or the impeachment evidence must undermine critical trial testimony.  When those connections are missing, as they are here, or the impeachment evidence is less significant, as it is here, the newly discovered evidence is merely impeaching and a new trial should not be granted on its basis.  For this reason, we will affirm the District Court's order entered on February 25, 2009, denying a new trial.  We also will affirm the order entered on August 14, 2008, denying appellant Gloria Quiles's motion for a new trial.  Viewing the evidence in the light most favorable to the government, there was sufficient evidence to convict her.  Moreover, we will affirm the sentence of German Quiles.  The Court conducted a full sentencing hearing and then sufficiently explained why it was imposing a below-guideline sentence of 60 months imprisonment.   Thus, we will affirm the judgments of conviction and sentence entered in the District Court on February 27, 2009, in No. 09-1667, and on March 3, 2009, in No. 09-1686.