**UNITED STATES of America**

v.

**Nyame Amoah MENSAH, a/k/a Foster**

**Nyame Amoah Mensah, Appellant.**

**No. 10–3751.**

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit LAR 34.1(a) June 23, 2011.

Opinion filed: June 28, 2011.

---

Donovan Cocas, Assistant U.S. Attorney, Office of the United States Attorney, Pittsburgh, PA, for United States of America.

Craig A. Sopin, Esq., Philadelphia, PA, for Nyame Amoah Mensah.

Before: HARDIMAN and GREENBERG, Circuit Judges, and POLLAK, District Judge.*

* Honorable Louis H. Pollak, Senior Judge of    the United States District Court for the East-

## OPINION

POLLAK, District Judge.

In August 2009, a jury found Nyame Amoah Mensah guilty of conspiracy to distribute in excess of one kilo of heroin. After the trial, Mensah learned that the government's principal witness against him, one of his co-conspirators, stated to two prison inmates that Mensah was not part of the conspiracy. Mensah then moved for a new trial under Fed.R.Crim.P. 33. The District Court denied his request and he now appeals to this court. We will affirm the District Court's order denying the motion for a new trial for substantially the reasons given by the District Court.

### I.

Because we write primarily for the parties, who are of course familiar with this case, we address only the facts and procedural history relevant to resolution of the issues raised in this appeal.

Nyame Amoah Mensah was charged with one count of conspiracy to distribute in excess of one kilo of heroin in violation of 21 U.S.C. § 846. Notably, the government alleged that, in early 2008, Mensah "body carried" heroin into the United States from Ghana on behalf of an international heroin trafficking ring.[1] On August 11, 2009, a jury trial commenced for Mensah and four other alleged co-conspirators. At trial, the government presented transcripts of wiretapped phone conversations between Mensah and one of the leaders of the conspiracy, Emmanuel Kofi Adusei ("Adusei"). Although Adusei initially maintained to the FBI that Mensah was not involved in the conspiracy, he later changed his account after learning that the government had wiretapped his phones. Adusei pled guilty and agreed to testify against Mensah. During the trial, defense counsel extensively cross-examined Adusei about his prior inconsistent statements to the FBI and about his motives for cooperating. The trial concluded on August 21, 2009, with the jury finding Mensah guilty and acquitting the other four defendants.

While Mensah was awaiting sentencing at the Northeast Ohio Correctional Center, he learned from two other inmates, Alvin Thomas and Cornelius Newbern, that Adusei, the government's sole witness against him, had stated on two separate occasions in 2008 that Mensah was not involved with the conspiracy. Adusei made these statements around the same time that he was also telling the FBI that Mensah was not part of the conspiracy, and before he was confronted with the government's wiretap evidence.

On November 10, 2009, Mensah filed a timely motion for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure on the basis of the newly-discovered evidence of Adusei's statements to the two inmates. On January 10, 2010, the District Court conducted an evidentiary hearing, during which it heard testimony from the two inmates, FBI Special Agent Sandra Maier, and James Brink (Adusei's trial counsel). On August 30, 2010, the District Court issued an order and opinion denying Mensah's motion for a new trial. Mensah now appeals the Court's order.

---

ern District of Pennsylvania, sitting by designation.

1. As the government explains, the heroin trafficking ring recruited people known as "body carriers" to ingest hard capsule-like "slugs," each of which contained approximately 10 grams of heroin. Body carriers would ingest approximately 40 to 80 of these slugs in Ghana and then fly to the United States. Once in the United States, the carriers would defecate and clean the slugs and then pass them along to members of the ring.

## II.

The District Court had jurisdiction under 18 U.S.C. § 3231, and this court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

We review a district court's determination of whether to grant a new trial for an abuse of discretion. *United States v. Brown*, 595 F.3d 498, 511 (3d Cir.2010). As we have explained, "a district court abuses its discretion if its decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *Montgomery v. Pinchak*, 294 F.3d 492, 498 (3d Cir.2002).

Under Federal Rule of Criminal Procedure 33(a), the trial court may, upon defendant's motion, "vacate any judgment and grant a new trial if the interest of justice so requires." Motions under Rule 33 are "not favored and should be granted sparingly and only in exceptional cases." *United States v. Silveus*, 542 F.3d 993, 1005 (3d Cir.2008) (citations omitted). This court has articulated five criteria that a defendant must meet before he may be granted a new trial on the basis of newly-discovered evidence: (1) the evidence must be newly discovered, i.e., discovered since the trial; (2) facts must be alleged from which the court may infer diligence on the part of the movant; (3) the evidence must not be merely cumulative or impeaching; (4) the evidence must be material to the issues involved; and (5) the evidence must be such, and of such nature, as that, on a new trial, it would probably produce an acquittal. *United States v. Kelly*, 539 F.3d 172, 181–182 (3d Cir.2008). The movant has a "heavy burden" of proving each of these requirements. *United States v. Cimera*, 459 F.3d 452, 458 (3d Cir.2006). If just one of the requirements is not satisfied, a defendant's Rule 33 motion must fail. *United States v. Jasin*, 280 F.3d 355, 365 (3d Cir.2002).

The District Court found that Mensah satisfied three of the five criteria: the evidence was newly discovered; Mensah was diligent in pursuing the evidence; and the evidence was material. However, the Court determined that Mensah had failed to satisfy the other two requirements, because the inmates' statements were merely impeaching and cumulative and because a jury would probably not acquit Mensah even if it knew of the inmates' statements. In this appeal, Mensah challenges both of these determinations. We will address each of them in turn.

First, as a general rule, a new trial will not be granted under Rule 33 where the new evidence is merely cumulative or impeaching. *United States v. Saada*, 212 F.3d 210, 216 (3d Cir.2000). Evidence that is impeaching lacks an "exculpatory connection" to the defendant's conduct. *Id.* Cumulative evidence is that which merely reiterates or reinforces testimony or evidence that the jury has already heard. *Id.*

■ Mensah argues that in exceptional circumstances, a court may grant a new trial on the basis of impeachment evidence alone and that the impeachment evidence is so overwhelming that it undermines the government's entire case. While this court has ruled that in exceptional circumstances a new trial may be granted on the basis of impeachment evidence alone, it has stressed that there must be either (1) a strong exculpatory connection between the new evidence and the charge against defendant, or (2) the new evidence must seriously undermine evidence presented at trial. *United States v. Quiles*, 618 F.3d 383, 392 (3d Cir.2010). The connection between the new evidence and the verdict must be so strong that it suggests the defendant was wrongly convicted. *Id.* at 393. To illustrate this exacting standard, the court in *Quiles* pointed to a series of

cases in which, after trial, some event transpired which seriously undermined the credibility of a critical witness or piece of evidence that was previously thought to be reliable. *Id.* at 392–93 (citing *United States v. Davis*, 960 F.2d 820, 825 (9th Cir.1992) (new evidence showed that primary witness was a "crooked cop" who had tampered with evidence); *United States v. Taglia*, 922 F.2d 413, 415 (7th Cir.1991) (new evidence showed that a key witness routinely committed perjury when testifying as an informant); *United States v. Lipowski*, 423 F.Supp. 864, 867–68 (D.N.J. 1976) (new evidence strongly suggested the conviction was based upon fabricated evidence)).

This case is readily distinguishable because Adusei's credibility was already repeatedly undermined during trial. Mensah's counsel extensively questioned Adusei about his prior inconsistent statements regarding Mensah to the FBI. His counsel also pointed to other evidence suggesting that Adusei was untrustworthy, including his illegal entry into the United States and his use of a forged passport. The new evidence merely reinforces an argument that was already strongly presented at trial: that Adusei was not a credible witness. Further, as the government points out, Adusei's statements to the inmates were made at approximately the same time as his similar statements to the FBI. Mensah has pointed to no evidence suggesting that Adusei has ever made such statements after the government confronted him with the transcripts of his wiretapped conversations, which prompted him to implicate Mensah in the conspiracy. As a result, the new evidence does not "strongly demonstrate that critical evidence at the trial against the defendant was very likely to have been false." *Id.* at 393. Therefore, Mensah has failed to present the kind of exceptional impeachment evidence upon which a motion for a new trial may be based.

■ For similar reasons, the new evidence is also cumulative. The testimony of the two inmates impugns Adusei's credibility, but defense counsel extensively questioned Adusei as to his credibility and his inconsistent statements to the FBI. Moreover, as noted above, Adusei's statements to the two inmates that Mensah was not involved with the conspiracy were contemporaneous with his statements to the FBI. Thus, the additional testimony would serve only to reinforce what the jury had already heard. *Quiles*, 618 F.3d at 392. Accordingly, the District Court did not abuse its discretion in determining that the evidence was merely cumulative and impeaching and did not warrant a new trial.

■ Even if the new evidence was not merely impeaching or cumulative, appellant's motion for a new trial would still fail because the new evidence would probably not produce an acquittal during a new trial. *See Quiles*, 618 F.3d at 392; *Kelly*, 539 F.3d at 182. When evaluating whether the evidence is likely to produce an acquittal, the court considers the new evidence in light of all of the evidence presented at trial. *See Kelly*, 539 F.3d at 189 (holding that a court analyzes "the evidence already weighed and considered by the jury at trial"). Where a particular piece of evidence presented at trial is challenged as tainted, we have denied motions for a new trial where there was sufficient independent evidence to sustain a finding of guilt. *Saada*, 212 F.3d at 217 n. 6.

In this case, there are two independent pieces of evidence that, when considered together, are sufficient to support Mensah's conviction. First, even if Adusei's testimony that Mensah was involved in the conspiracy is disregarded, Adusei still testified at some length regarding how his

heroin trafficking ring smuggled heroin into the United States using body carriers. Adusei's use of such body carriers formed the basis for his guilty plea. The new evidence from the inmates does not directly contradict his testimony that he imported heroin via body carriers—indeed, it tends to confirm it. *See* App'x at 196 (affidavit by Alvin Thomas quoting Adusei as saying that Mensah "has nothing to do with this, it is his brother"). The new evidence would thus be of little value in impeaching Adusei's testimony regarding his use of body carriers.

Second, the government presented transcripts of wiretapped phone conversations between Adusei and Mensah that describe Mensah's transportation of heroin into the United States and the recruitment of Mensah's brother to smuggle heroin. Mensah argues that the transcripts—in which the conspirators are careful never to actually use the word "heroin"—are meaningless without Adusei's testimony that Mensah was part of the conspiracy. However, viewed in light of Adusei's testimony at trial regarding how the smuggling ring used body carriers, we agree with the District Court that the wiretap transcripts would "make absolutely no sense if … all [Mensah] brought back were legal medications and a birth certificate."[2]

### III.

Because the new evidence is insufficient to merit a new trial under Fed.R.Crim.P. 33 and because the District Court did not

abuse its discretion in denying Mensah a new trial, we will affirm.

---

2. For example, in the March 20, 2008 transcript, Mensah stated that he gave Adusei a birth certificate and drugs, referring to the prenatal vitamins. Mensah then stated that he also gave Adusei "37," but that there were still three including "1 left that hasn't come yet." He added that he was "making some fufu to eat to see if the thing …" before Adusei cut him off. *See* App'x 227–29; *see also Compact Oxford English Dictionary* 584

(1984) (defining fufu as a food "composed of yam, plantain, or cassava; it is peeled, boiled, pounded and made into balls"). In context, this conversation is clearly referring to Mensah's defecation of heroin slugs that he had body carried into the United States. Mensah has advanced no other plausible interpretation of it, or of the other incriminating passages in the transcripts.