PEOPLE v. MARTIN.

1. TRIAL—INSTRUCTIONS—REQUESTS NOT SUPPORTED BY EVIDENCE.
   Where it appeared from the undisputed testimony of the prosecutrix, upon a trial for larceny, that the money alleged to have been feloniously converted by respondent was intrusted to her by the prosecutrix for the purpose of purchasing a bicycle for the prosecutrix, there was no error in a refusal to instruct the jury as to what should be their verdict in case they should find that the prosecutrix, at the time of the delivery of the money, intended to pass the title to the same.

2. LARCENY—WHAT CONSTITUTES—INTENT.
   One who obtains money from another upon the representation that he will procure certain property therewith for the latter, intending at the time to convert the money, and actually converting it, to his own use, is guilty of larceny.

3. NEW TRIAL—MISCONDUCT OF JURY—HEARSAY.
   An application for a new trial in a criminal case, based solely upon the affidavit of counsel that a newspaper article relating to the case was read by the jury after the cause had been submitted to them, and that he had been informed by some of the jurors that such article influenced them in arriving at their verdict, is properly denied.

Exceptions before judgment from superior court of Grand Rapids; Burlingame, J. Submitted January 28, 1898. Decided March 29, 1898.

Isma Martin was convicted of larceny. Affirmed.

*McKnight & McAllister*, for appellant.

*Fred A. Maynard*, Attorney General, and *Frank A. Rodgers*, Prosecuting Attorney (*Rodgers, McDonald & Corwin*, of counsel), for the people.

MOORE, J. The respondent was convicted in the superior court of Grand Rapids of the offense of larceny of

property belonging to Gertrude Anderson. There are many assignments of error, but the important question in the case is whether the facts shown by the testimony constitute the offense of larceny. The respondent offered no testimony. The jury, in order to convict, must have believed the testimony offered by the people, which was to the following effect: In the early part of 1897 the respondent came to Grand Rapids as a solicitor for a life-insurance company of which S. F. Angus was the Detroit manager. She made the acquaintance of Miss Earle, one of the examining physicians of the life-insurance company, and through her made the acquaintance of Miss Anderson, who was keeping house, with one servant, in Grand Rapids. She solicited Miss Anderson to become insured, but Miss Anderson did not consent. About the middle of February an arrangement was made that Miss Martin was to board with Miss Anderson, and she did so from then until the 15th of April, when Miss Martin left Grand Rapids.

Miss Anderson had a bicycle. About the 1st of March there was talk between them about purchasing a bicycle, and Miss Martin said she was going to have a new wheel, and should buy it very cheap, through a friend of hers, and, if Miss Anderson wanted one, she could get one for her, and she thought she could sell the old wheel to a lady she knew in Detroit. Miss Anderson at this time was employed in the office of the United States engineer, where there were a number of persons employed. A little later Miss Martin suggested to Miss Anderson that she thought she could get wheels for her associates in the office, considering them also as friends, at the same price. Miss Anderson decided to take a wheel, and then told her associates what Miss Martin proposed. Miss Martin came to the office March 13th, and arranged to take the orders for wheels for Miss Anderson and several of her associates. Miss Martin sat down at Miss Anderson's desk, and wrote what she said was a letter to the friend through whom she was to get the wheels, E. J. Moran.

Miss Anderson was to have a high-grade Cleveland wheel at a cost of $38, which amount she paid in cash to Miss Martin. Mr. Schauroth gave her an indorsed government check for $100 and $14 in money. Capt. Townsend gave her a check for $38. Mr. Wallace gave her $18, and Miss Martin offered to loan him $20 to make up his $38.

Miss Martin folded up what had been delivered to her, and folded up the letter, and put them all in an envelope, and asked Miss Anderson to go with her to the express office to buy the money order, which Miss Martin said she wanted to get off that night. This was between half past 4 and 5 o'clock. On the way to the express office Miss Martin said she must first go to the office of Dr. King to get the $20 she was to let Mr. Wallace have. The two went to the office, and Miss Martin went in, and, after being gone for awhile, returned, and reported that Dr. King was not in, and she would have to see him later. She then said she must go to the U. B. A. Home on business, and Miss Anderson walked up there with her. They then came down town. It was nearly 6 o'clock, and, fearing the money-order department of the express office would be closed later, they went to the express office, and arranged that the checks which had been given Miss Martin should be received and cashed by the express company, and a money order be issued to Miss Martin later, when she had collected the $20 of Dr. King. It was then so late that Miss Anderson went home, and left Miss Martin to finish the business. Miss Martin returned to the express office, and bought an order for $50, and one for $43, in favor of S. F. Angus, Detroit, and one for $28 in favor of Mrs. F. B. Martin, Detroit, and no other orders on that day or on the 14th, 15th, or 16th of March were issued to Isma Martin, and none were issued in favor of E. J. Moran. About 7 o'clock or after, Miss Martin returned to the residence of Miss Anderson, and held up a piece of paper some distance from her, and said, "Here is the receipt for that money." After this the women talked

about the wheels, which did not come. About a week before Easter, Miss Martin showed Miss Anderson a letter, which she said was from her friend through whom she was getting the wheels, saying if they would wait until Easter Monday the wheels would have the late improvements. The next Thursday after Miss Martin showed this letter, she left the house, saying she was going to Detroit, and would return the following Monday. She did not return, and Miss Anderson did not see her again until she saw her in court after her arrest. Miss Anderson never received any wheel. She testified that she never consented that Miss Martin should use the money she gave her for any other purpose than to purchase for her a bicycle.

It is the position of the people that from the foregoing facts, and the necessary and reasonable inferences to be drawn from them, the jury were warranted in finding the respondent guilty of larceny. The position of respondent is stated in a request to charge reading as follows:

"If you find from the evidence in the case that the money was delivered by Gertrude Anderson to respondent, intending at the time of the delivery to pass the title to the same, no matter how fraudulent the transaction on the part of the respondent turned out to be, you must acquit the respondent of the offense charged."

In support of this proposition counsel cite 2 Archb. Cr.. Pl. 372; 1 Whart. Cr. Law, §§ 964, 965; 2 East, P. C. 668; *Ross* v. *People*, 5 Hill, 294; 2 Bish. Cr. Law, § 808; *Hildebrand* v. *People*, 56 N. Y. 396 (15 Am. Rep. 435); *People* v. *McDonald*, 43 N. Y. 61; *Zink* v. *People*, 77 N. Y. 126 (33 Am. Rep. 589).

While it is conceded by the people that Miss Anderson consented to part with the possession of her money, they contend that her consent was fraudulently obtained, and that she did not intend to part with the title of her property to Miss Martin, but that it was delivered to her for a special purpose, and for that reason the offense is

larceny; citing *People* v. *Shaw*, 57 Mich. 403 (58 Am. Rep. 372); *Stinson* v. *People*, 43 Ill. 397; *Welsh* v. *People*, 17 Ill. 339; *Murphy* v. *People*, 104 Ill. 533; *Com.* v. *Barry*, 124 Mass. 325; *People* v. *Abbott*, 53 Cal. 284 (31 Am. Rep. 59).

It is sometimes difficult to determine in a given case whether the offense is larceny or whether it is a case of false pretenses. We think the rule to be gathered from the authorities may be stated to be: In larceny, the owner of the thing stolen has no intention to part with his property therein; in false pretenses, the owner does intend to part with his property in the thing, but this intention is the result of fraudulent contrivances. If the owner did not part with his property in the thing, but simply delivered the possession, the ownership remaining unchanged, for the purpose of having the person to whom the property was delivered use it for a certain special and particular purpose, for the owner, the title would not pass, and its felonious conversion would be larceny. A distinction is made between a bare charge for special use of the thing, and a general bailment; and it is not larceny if the owner intends to part with the property and deliver the possession absolutely, although he has been induced to part with the goods by fraudulent means. If, by trick or artifice, the owner of property is induced to part with the possession to one who receives the property with felonious intent, the owner still meaning to retain the right of property, the taking will be larceny; but if the owner part with not only the possession, but right of property also, the offense of the party obtaining the thing will not be larceny, but that of obtaining the goods by false pretenses. As was said in *Loomis* v. *People*, 67 N. Y. 329 (23 Am. Rep. 123):

"There is, to be sure, a narrow margin between a case of larceny and one where the property has been obtained by false pretenses. The distinction is a very nice one, but still very important. The character of the crime depends upon the intention of the parties, and that intention deter-

mines the nature of the offense. In the former case, where, by fraud, conspiracy, or artifice, the possession is obtained with a felonious design, and the title still remains in the owner, larceny is established; while in the latter, where title, as well as possession, is absolutely parted with, the crime is false pretenses. It will be observed that the intention of the owner to part with his property is the gist and essence of the offense of larceny, and the vital point upon which the crime hinges and is to be determined."

In this case the respondent made the acquaintance of the prosecutor, and pretended he had a check he wanted cashed. The prosecutor went with him to a saloon, where they met a confederate of respondent, and dice were thrown. The respondent asked the prosecutor to lend him $90, saying he was sure to win, and that, if he did not, he had the check, which he would get cashed and pay him back. The money was loaned, the dice were thrown, respondent lost, and the prosecutor insisted upon having his money back. The check was then put up and lost, and the confederates went away carrying the money with them. The court said the respondent was properly convicted.

In *Stinson* v. *People*, 43 Ill. 397, it is said: "If the owner parts with the possession voluntarily, but does not part with the title, expecting and intending the same thing shall be returned to him, or that it shall be disposed of on his account, or in a particular way, as directed or agreed upon, for his benefit, then the goods may be feloniously converted by the bailee, so as to relate back, and make the taking and conversion a larceny, if the goods were obtained with that intent;" and the conviction of larceny was held to be proper. This was a case where the prosecutor had been induced to wager his money with one of the respondents, and had delivered it to a third person, who was selected as a stake-holder, the other confederate depositing what was represented as a package containing a like amount of money, but which was in fact waste paper.

The case of *People* v. *Shaw*, 57 Mich. 403, is an

instructive one. Shaw and Jones were confederates. Shaw claimed to be an agent for a tea house, and explained the method of selling tea by means of cards. While he was doing this, Jones came up, and pretended to be a stranger, and took part in the transaction, which resulted in Brown letting Shaw have $80, which Shaw bet with Jones. The card was drawn, and Shaw lost, and he at once delivered the money to Jones. Justice CAMPBELL, in writing the opinion, made use of the following language: "There is some rather attenuated discrimination to be found in the books between such cheats as induce a person to give temporary custody of his property to another, who keeps or disposes of it, and those whereby he is induced to part with it out and out. We do not think it profitable to draw overnice metaphysical distinctions to save thieves from punishment. If rogues conspire to get away a man's money by such tricks as those which were played here, it is not going beyond the settled rules of law to hold that the fraud will supply the place of trespass in the taking, and so make the conversion felonious;" and sustained the conviction of respondents for larceny.

Applying these rules of law to this case, what is the result? It must be borne in mind that Miss Anderson was not buying of Miss Martin a bicycle for $38, but was intrusting to her, as her friend and agent, $38 to be used for a special purpose. She did not intend, when she gave Miss Martin the possession of the property, to also give her the title to it, so that it might be said the money belonged to Miss Martin. She parted with the possession so the money might be devoted to a specific purpose for the benefit of Miss Anderson. If, at the time she obtained the property, the respondent obtained it by false representations, intending at the time to convert it to her own use, and with the intent to deprive Miss Anderson of her property, she was guilty of larceny.

Error is alleged upon the conduct of the judge during the trial and remarks of the prosecuting attorney during

his argument to the jury.   Error is also assigned upon the admission of evidence and to the charge of the court. It is not necessary to refer to these assignments further than to say we do not deem any of them well taken.

A motion for a new trial was made, based upon the affidavit of counsel that during the deliberations of the jury, after the case had been submitted to them, they obtained and read a Grand Rapids paper containing an article in relation to the trial which was prejudicial to the respondent, and that counsel had been informed by some of the jurors that the article influenced jurors in arriving at their verdict.   This motion was overruled, and it is said that this is error.   It does not very clearly appear how counsel knew that the jurors had the paper mentioned.   It does appear, however, that all he knew about what effect the reading of the paper had upon the verdict was what he was told by some of the jurors.   This was hearsay, and incompetent.   The court did not err in refusing to grant a new trial upon the showing made.

Conviction is affirmed, and case remanded for further proceedings therein.

The other Justices concurred.