ZAHRA, J.
(concurring in part and dissenting in part). I concur with the majority that the four-part test set forth in People v Cress[1] is used to determine whether a defendant has established entitlement to a new trial, and I further concur that newly discovered evidence that impeaches a witness may, in rare cases, be grounds for a new trial if it satisfies the Cress test. Specifically, I agree that a material, exculpatory connection must exist between the newly discovered evidence and significantly important evidence presented at trial, but I strongly disagree that “it may be of a general character and need not contradict specific testimony at trial.” Ante at 300. Rather, I believe that new impeachment *343 evidence could make a different result probable on retrial only if it directly contradicts material trial testimony in a manner that tends to exculpate the defendant.[2] Because I do not believe that defendant’s new impeachment evidence satisfies the Cress test in this case, I dissent from the majority’s application of the Cress test and its decision to remand this case to the trial court to again address this issue. The new evidence offered to impeach the complainant does not contradict any of her testimony at trial or address in any manner the events in this case. More importantly, this case did not hinge on the complainant’s uncorroborated account of this assault. Substantial independent evidence at trial corroborated the complainant’s testimony that defendant raped her:
• The complainant identified defendant after reviewing 7,800 photographs at a police station over the course of four to five days.
• Defendant worked at the very Meijer store in whose parking lot the rape occurred, and his shift began shortly after the rape.
• The complainant described a “gold nugget” ring that her attacker wore and used to rape her, and defendant pawned just such a ring a mere four days after the rape, but then denied to the police that he had ever owned such a ring until presented with evidence that he had pawned it.
• The complainant described a skull tattoo that defendant had on his upper right arm, a tattoo that was not visible when defendant was wearing his Meijer uniform.
• Defendant radically altered his appearance shortly before a lineup, to such an extent that the police officer *344 who had seen defendant earlier that day to tell him about the lineup could not recognize him.
• Medical and lay testimony reflected that the complainant suffered injuries to her face, shoulder, neck, arms, thighs, and vagina that were consistent with her testimony that defendant had beaten and raped her.
In my view, the majority fails adequately to account for this independent evidence in concluding that a remand is required to determine whether a different result is probable on retrial. Consider what a jury would have to believe in order to find that the complainant fabricated her rape claim. The jury would have to be convinced that the complainant, in perpetrating her false claim, spent four to five days at the police station looking at nearly 8,000 photographs and then was somehow able to select a person who (1) worked at the Meijer store at which complainant claimed the rape occurred, (2) began his shift shortly after the time of the alleged rape, (3) happened to own a gold nugget ring just like the one the complainant described, (4) happened to pawn that ring a few days after the alleged rape, (5) subsequently denied pawning the ring until presented with evidence that he did so, and (6) happened to have a skull tattoo on his upper right arm as complainant described. Not only would the jury have to believe all of this, but it would also have to conclude that defendant, despite his innocence, chose for some reason to alter his appearance by shaving his head and beard before a lineup. And a jury would also have to discount lay and medical testimony regarding the complainant’s multiple injuries that were consistent with the beating and rape that she described.
In light of the substantial evidence that did not depend on the complainant’s credibility, I cannot conclude that a jury on retrial would probably acquit defendant on the basis of the new impeachment evi *345 dence. The trial court did not abuse its discretion by denying defendant’s motion for a new trial. Accordingly, I would affirm the trial court’s decision.
ANALYSIS
A trial court’s decision to grant or deny a motion for a new trial is reviewed for an abuse of discretion.[3] An abuse of discretion occurs only when the trial court’s decision falls outside the range of reasonable and principled outcomes.[4] “A mere difference in judicial opinion does not establish an abuse of discretion.”[5]
The majority correctly articulates the four-factor test that must be met before a new trial may be granted on the basis of newly discovered evidence:
For a new trial to be granted on the basis of newly discovered evidence, a defendant must show that: (1) the evidence itself, not merely its materiality, was newly discovered; (2) the newly discovered evidence was not cumulative; (3) the party could not, using reasonable diligence, have discovered and produced the evidence at trial; and (4) the new evidence makes a different result probable on retrial.[6]
This test has existed in our caselaw for more than a century.[7] The only factor in dispute here is whether the new evidence makes a different result probable on retrial.[8]
*346 In Spray v Ayotte, this Court explained, “Ordinarily a new trial will not be granted because of newly discovered evidence to impeach a witness.”[9] Subsequent cases have applied this principle in the criminal context.[10] I agree with the majority that our caselaw has not characterized this principle as a strict, per se rule prohibiting the grant of a new trial because of newly discovered impeachment evidence, even though some Court of Appeals panels have apparently treated it as such.[11] Rather, the principle enunciated in Spray simply recognizes that it is only in rare cases that newly discovered impeachment evidence will satisfy the traditional four-factor test for granting a new trial.[12]
The question thus arises regarding what unusual circumstances could permit newly discovered impeachment evidence to satisfy the Cress test. This Court in Spray cited the Cyclopedia of Law and Procedure, which delineates the exceptions to the general rule:
Ordinarily a new trial will not be granted for newly *347 discovered evidence to impeach a witness. Thus evidence to show that a witness had made statements inconsistent with his testimony or to contradict him on immaterial or collateral matters is seldom ground for a new trial. But evidence of contradictory statements made by a witness on whose testimony a doubtful verdict was founded has sometimes been held sufficient cause for setting aside the verdict. Newly discovered evidence to successfully contradict a witness upon a material matter may be cause for allowing a new trial, and it is no objection to such allowance that the evidence may incidentally impeach a witness.[13]
Thus, newly discovered evidence that contradicts particular and material statements in a witness’s testimony could potentially satisfy the four factors for granting a new trial, as opposed to newly discovered evidence that only serves to impeach a witness’s credibility.[14]
Both federal and Michigan caselaw support this explanation for when a new trial is warranted. For example, in United States v Saada, a prosecution witness who testified pursuant to a cooperation agreement with the government was later caught on tape urging another indi *348 vidual to falsely implicate an innocent person in another case in order to receive a reduced sentence on a pending charge.[15] The defendants sought a new trial on the basis of this new evidence.[16] The United States Court of Appeals for the Third Circuit concluded that the new evidence did not satisfy the requirements for granting a new trial.[17] In particular, the court noted that the new evidence was “only impeaching” and that there was “no exculpatory connection” between the witness’s act of urging someone to falsely implicate an Innocent person in another case and the defendants’ crimes.[18] Moreover, the new evidence would probably not have produced an acquittal because there was sufficient evidence of guilt independent of the witness’s testimony.[19]
Relying in part on Saada, the Third Circuit in United States v Quiles summarized the general principle regarding newly discovered impeachment evidence as follows:
[L]ong experience has shown that newly discovered evidence that is merely impeaching is unlikely to reveal that there has been a miscarriage of justice. There must be something more, i.e. a factual link between the heart of the witness’s testimony at trial and the new evidence. This link must suggest directly that the defendant was convicted wrongly. ... When this connection is not present, then the new evidence is merely impeaching and its revelation does not warrant granting a new trial.[20]
Therefore, “[w]hen asked to grant a new trial solely on the basis of new impeachment evidence, a court care *349 fully should examine whether the defendant has demonstrated the necessary exculpatory connection between the evidence and the offense or has demonstrated that the newly discovered evidence totally undermined critical inculpatory evidence.”[21] The exculpatory connection must be “strong.”[22] Moreover, “[d]etermining the strength and importance of the exculpatory connection or the significance of the newly discovered evidence with respect to the credibility of critical evidence given at the trial is a difficult task that is left in the first instance to the discretion of the [trial] court.”[23]
Recently, in People v Armstrong, we applied a similar analysis in the analogous context of a claim of ineffective assistance of counsel.[24] In Armstrong, the defendant’s attorney failed to introduce cellular telephone records that revealed the complainant’s frequent attempts to contact the defendant after his alleged rapes.[25] In concluding that the defendant was prejudiced by this failure, we acknowledged that the complainant’s credibility at trial had been challenged in various ways, including with evidence that she had falsely accused another person of rape on a prior occasion.[26] “Although unquestionably significant, such attacks had less of a tendency to undermine the complainant’s credibility than the cell phone records, which would have provided documentary proof strongly suggesting that the complainant lied to this jury regarding her actions in connection with the alleged rapes in this *350 case.”[27] That is, “[t]he cell phone records revealing frequent communication with defendant following the alleged rapes would have cast serious doubt on the substance of her accusations.”[28]
In light of these authorities, I conclude that newly discovered evidence to impeach a witness could potentially make a different result probable on retrial if it directly contradicts material testimony by that witness at trial in a manner that tends to exculpate the defendant. By contrast, new evidence that merely impeaches a witness on a collateral or immaterial matter, unrelated to the substance of the charges in the case at hand, lacks the requisite exculpatory connection to warrant a new trial.
In this case, defendant has failed to establish an exculpatory connection between the newly discovered evidence and the offense at issue. The new evidence consists primarily of police reports concerning events that occurred in California more than four months after the rape in this case.[29] The police reports contain no information that contradicts or even addresses the complainant’s testimony at trial regarding the rape that occurred in this case. Thus, because the reports do not contradict any evidence presented at trial, let alone material evidence, an exculpatory connection simply does not exist.
What the California police reports do contain can only be described as a confusing series of hearsay statements attributed to the complainant regarding other purported sexual assaults that occurred at vari *351 ous points in her life, including during her trip to California and during her childhood. Some of the hearsay statements are secondary or tertiary hearsay within hearsay. Although the reports suggest that the complainant retracted her accusation regarding an alleged assault in Colorado on her way to California and also retracted a claim that she was kidnapped in California, the record contains no direct evidence of falsity regarding the other alleged sexual assaults. It is thus not clear on what grounds the vast majority of the purported accusations would be admissible on retrial. Nor is it apparent on what theory the evidence of sexual-assault claims that occurred after the rape in this case would be admissible. Although a “defendant should be permitted to show that the complainant has made false accusations of rape in the past,”[30] no established theory of relevance has been identified for the admission of subsequent allegations of rape or of allegations for which no evidence of falsity has been presented.[31] Also, the reports contain no evidence of the complainant’s sexual conduct that would be probative of bias or an ulterior motive to make a false charge.[32]
*352 In her concurrence, Justice MARILYN KELLY aggregates the newly discovered hearsay evidence to engage in a speculative enterprise that would grant a new trial on the basis of evidence that might never even be admitted — and indeed might not even be admissible — at trial. However, when considering whether newly discovered evidence satisfies the Cress standard, the reviewing court should only consider admissible evidence.[33]
Even assuming, however, that the substance of the California police reports is somehow relevant and could be admitted, it is not clear whether a jury would find that this new evidence undermines the complainant’s credibility to such an extent that the jury would disbelieve her testimony that defendant had raped her in Michigan four months earlier. Whatever exculpatory theory defendant might offer to explain the newly discovered evidence,[34] he simply has not established that a jury would more likely accept that theory than the prosecution’s explanation, which is that the rape in this case caused the complainant to suffer from an emotional trauma that led to her subsequent actions in California. The prosecution explained this theory at the hearing on defendant’s motion for relief from judgment or a new trial:
*353 I would represent to the Court, I followed up on that when I received this material and I talked to an expert in the area of mental health and gave them the scenario and asked specifically: Is this unusual? Because that’s what the defense has been representing to the Court here this morning, that this is outrageous, this is just unheard of that something like this would happen four to five months after a rape. But what this professional tells me is it’s not unusual at all. You’ve got a victim suffering from Post Traumatic Stress Disorder. She’s not been able to deal with what happened to her in that parking lot at Meijer. It hasn’t been resolved. It hasn’t even been reported to critical key people and so she’s decompensating and that’s what he told me and I fully expect, your Honor, had we had to hash this out in front of a jury, that not only he but other experts would come in and support that suggestion that this is not unusual behavior but, in fact, it corroborates what happened to her. It reinforces the fact that she had been through a traumatic experience in May of that year, which ultimately led to this behavior.
In short, it is far from obvious that any exculpatory defense theory would be more believable to a jury than the prosecution’s theory that the rape caused an emotional trauma leading to the events in California. Remember, it is the defendant’s obligation to satisfy the Cress factors,[35] including the fourth factor requiring that “the new evidence makes a different result probable on retrial.”[36] Given that defendant has failed to articulate why a jury on retrial would more likely believe an exculpatory defense theory over the prosecution’s alternative theory that is consistent with defendant’s guilt, the fourth Cress factor has simply not been satisfied, and defendant is not entitled to a new trial.[37]
*354 Further undermining any exculpatory defense theory is that substantial independent evidence of guilt corroborated the complainant’s testimony that defendant raped her.[38] The trial in this case was not a simple *355 “he said/she said” credibility contest. When testifying regarding the beating and the digital and penile penetrations by the use of force that defendant committed after he approached her minivan in a Meijer parking lot, the complainant described a “gold nugget” ring, containing several small stone chips and ridges, that defendant inserted into her vagina with the middle finger of his left hand during the assault. When questioned by the police, defendant initially denied that he had ever owned any jewelry, including a gold nugget ring. But when presented with evidence that he had pawned a gold nugget ring at a business called The Hock Shop a mere four days after the alleged rape, defendant admitted that he had indeed pawned the ring there. The owner of The Hock Shop identified defendant at trial as the person who pawned the ring four days after the rape, and the owner’s records confirmed that defendant did so.[39]
*356 In addition, defendant worked at the Meijer store in whose parking lot the rape occurred. His shift started shortly after the rape. Defendant also had a skull tattoo on his upper right arm that would not have been visible when he was wearing his Meijer uniform. The complainant identified such a tattoo when describing defendant, stating that she saw part of the tattoo during the assault. A Meijer employee testified that employees are not required to wear their uniforms on the way to work; they are permitted to wear street clothes and then change when they arrive.[40]
*357 The complainant identified defendant after looking at 7,800 photographs at the police station over a period of four to five days. The first 6,800 photographs that she reviewed were contained in eight loose-leaf books. The books did not contain any identifying information regarding the persons in the photographs. She then looked at approximately 1,000 photographs in digital format on a computer. The digital format also did not reveal any identifying information about the persons shown. An officer testified that after the complainant had reviewed approximately 1,000 digital photographs, she became “quite emotionally upset, left the computer, went into a separate room crying and very visibly emotionally upset.” She then informed the officer that she had found the picture of the man who attacked her. Defendant was the person depicted in the photograph. The picture was taken a little more than two months after the rape in this case.
A lineup was then held. On the morning of the lineup, an officer went to defendant’s house to tell him to appear *358 for the lineup. When the officer saw defendant at his house that morning, he had “long hair, the long goatee-type, scraggly-looking beard. Unkept [sic]. He looked very unkept [sic].” Later that day, the officer went to the police station lobby to get defendant for the lineup. The officer testified: “There was [sic] several people sitting around in the lobby and I went back in, he wasn’t -1 said he wasn’t there. I didn’t recognize him in the lobby.” The officer then learned that defendant actually had been sitting in the lobby when the officer went to look for him. The officer had not recognized defendant in the lobby because “[h]e had shaved all of his hair off, all of his facial hair, completely, completely changed the way I’d seen him hours earlier.” A second officer who had seen a photograph of defendant also looked for him in the lobby, saw several people, and “didn’t believe he was there.” The second officer explained that she did not recognize defendant because “[h]e appeared very different from the photograph that I had seen of him.” In particular, when he arrived for the lineup defendant “was pretty well clean-shaven, his head, his face.” He also appeared heavier than in the photograph.[41]
In addition to this independent evidence of defendant’s guilt, evidence of the complainant’s behavior and physical condition following the attack corroborated her testimony. The complainant’s husband testified that when she returned from Meijer that day, she looked panicked and terrified. She also had a cut near her mouth. The complainant immediately went to her bedroom.[42] When her husband followed her into the bedroom and asked her what had happened, the complain *359 ant “was quite upset. She had a hard time finishing any sentences. Just kind of incoherent, rambling.”[43] Within the next day or two, the complainant’s husband saw large bruises on both of her arms and legs, including on her thighs. The complainant was still very upset when she went to the emergency room four days after the assault, and she had difficulty relating the event. Also, the police officer who took the initial report two days after the assault saw a large scratch on the complainant’s face and bruises on her shoulder. He testified that she was complaining of soreness on her chest, arms, and “pretty much all over.”[44] A friend whom the complainant had told about the rape three days after it occurred testified that the complainant was “very slow in speaking,” distant, and fearful.
The complainant first went to the emergency room two days after the assault. She did not disclose the sexual nature of the assault at that time but was treated for injuries to her left shoulder, neck, and arm.[45] Her left arm was bruised and swollen and was placed in a sling. Two days later, the complainant called her gynecologist and reported that she had been sexually as *360 saulted and wanted a full exam because she was growing worried about possible repercussions given that her assailant had not used a condom. She told the gynecologist about the penile penetration. The gynecologist directed the complainant to go back to the emergency room. Later that day, the complainant returned to the emergency room and reported the digital penetration but not the penile penetration.[46] A full rape kit was not prepared because only a digital penetration was reported and four days had passed since the assault. The complainant reported vaginal pain. An examination revealed internal abrasions on the right side of the vagina and the cervical area deep in the vagina. The attending physician testified that although other explanations were possible, his findings were consistent with a forceful digital penetration and a forceful penile penetration.
Eleven days after the rape, the complainant saw her gynecologist, who testified that the complainant was anxious and depressed. An examination revealed abrasions and scratches along the inner labia. The vaginal area was normal, but “[t]he vaginal area heals very quickly. So over a matter of a few days those would probably no longer be visible.” Abrasions that had occurred 11 days earlier would have been “healed by that point.” The gynecologist also observed “obvious” bruises on the complainant’s arms and inner legs.
More than a year later, the complainant told the police about the sexual nature of the assault after she *361 saw someone in a car behind her who matched the description of her assailant. The complainant explained that she went to the police because she felt “stronger” at that point and “wasn’t willing to live in fear anymore. I was ready to do what I needed to do. To get the person off the street who hurt me and changed my life.”[47] It was then that she reviewed the 7,800 photographs at the police station and identified defendant.
It is noteworthy that, as the Court of Appeals majority observed, defendant had already impeached complainant’s credibility at trial
by pointing out that she did not immediately report the nature of the attack and further, that her descriptions of the attack, while not wholly inconsistent, were incremental in the manner that she released the information to her husband and to the authorities. The [California] police reports of events that took place after the victim told several people that she had been raped and after objective evidence thereof had been obtained does not cast much doubt on events that took place several months earlier in Michigan.[48]
*362 In short, defendant has not established that a different result is probable on retrial because (1) the newly discovered evidence does not contradict any material (or, for that matter, immaterial) evidence presented at trial or pertain in any way to the offenses committed in this case, (2) the complainant had already been impeached in various ways at trial regarding her failure to immediately report the nature of the attack, and (3) significant objective evidence corroborates complainant’s testimony that defendant raped her. As the Court of Appeals majority explained:
[T]he significant objective evidence — defendant’s presence in the vicinity of the crime, the victim’s description of defendant’s tattoo and ring, defendant’s denial that he owned the ring, defendant’s pawning of the ring only four days after the attack, the victim’s identification of defendant’s picture, defendant’s radical change in appearance during the short time between being told to attend a lineup and his appearance therein, and medical evidence of injuries consistent with a sexual assault — did not involve the victim’s credibility and were legally sufficient to support defendant’s convictions. Moreover, none of it is affected in any way by the California police reports.[49]
To reach a different result on retrial, then, a jury would have to conclude not merely that the complainant fabricated her rape claim, but that after going through 7,800 photographs, she found the proverbial needle in the haystack, somehow choosing a photograph of an innocent man who coincidentally (1) worked at the location of the alleged rape, (2) was in the vicinity at the time, (3) had a ring like the one she described, (4) pawned the ring four days later, (5) subsequently denied *363 ever owning such a ring or, for that matter, any jewelry, (6) had a skull tattoo on his right upper arm like the one she described, and then (7) inexplicably shaved his head and heard right before a lineup.[50] And this conclusion must be reached despite the complainant’s medically documented injuries that were consistent with a rape and a beating.
We must not overlook that our review of this issue is deferential. It was the trial court, not the members of this Court, who tried the case and heard the evidence and thus was “without question ... in the best position to determine if the new [evidence] would tend to produce a probable different result on a retrial.”[51] The trial court possessed a superior ability to assess in the first instance the strength and importance of the newly discovered evidence in relation to the evidence presented at trial.[52] The majority states that the trial court *364 abused its discretion by denying a new trial because it erroneously believed that impeachment evidence could never be the basis for a new trial. However, the trial court also took note of the significant evidence of guilt that was independent of the complainant’s testimony:
Finally, this Court takes strong exception to defense counsel’s version of the facts that came out at trial for the jury’s consideration as contained in his Motion for a New Trial. The statement of facts as contained in the Prosecutor’s brief on this motion is much closer to my remembrance of the trial evidence. My point in commenting on this is that there was ample and strong competent evidence for the jury to convict Defendant independent of [the complainant’s] testimony.
This conclusion regarding the independent evidence of guilt fell within the range of reasonable and principled outcomes and fully supports the decision to deny a new trial. Therefore, to the extent that the trial court also based its decision in part on an erroneous line of Court of Appeals caselaw, reversal is not required. “A correct result may be reached and affirmed, although based on a wrong reason.”[53]
*365 Finally, the majority cites no authority for its assertion that “[t]he only facts that the trial court should consider in deciding whether to grant a new trial are those in the newly discovered evidence and those in the record.” Ante at 321. Whatever the merits of this unsupported assertion,[54] it is difficult to square with Justice MARILYN Kelly’s concurrence, in which she opines that “the newly discovered evidence has evidentiary value because, on trial, it may permit defendant access to the complainant’s medical, counseling, and psychological records,” including the complainant’s rape-support-group records. Ante at 326. None of those records are part of the newly discovered evidence, nor are they in the record. Thus, under the majority’s own opinion, consideration of those records would appear to be entirely off limits in deciding the motion for new trial.
CONCLUSION
In conclusion, I concur that the Cress test is used to determine whether a defendant is entitled to a new trial and that new impeachment evidence may, in rare cases, satisfy the Cress test. In particular, I agree with the majority that a material exculpatory connection must exist between the new impeachment evidence and significantly important evidence presented at trial, but I *366 strongly disagree that such new evidence “may be of a general character and need not contradict specific testimony at trial.” Ante at 300. New impeachment evidence could make a different result probable on retrial only if it directly contradicts material trial testimony in a manner that tends to exculpate the defendant. I respectfully dissent from the majority’s application of the Cress test and its decision to remand this case to the trial court. The trial court reached a reasonable and principled outcome by denying a new trial because the new impeachment evidence here does not make a different result probable on retrial. I would therefore affirm the trial court’s decision.
Young, C.J., and Mary Beth Kelly, J., concurred with Zahra, J.

 People v Cress, 468 Mich 678; 664 NW2d 174 (2003).

 See, e.g., People v Armstrong, 490 Mich 281, 291-292; 806 NW2d 676 (2011).

 Cress, 468 Mich at 691.

 People v Blackston, 481 Mich 451, 460; 751 NW2d 408 (2008).

 Cress, 468 Mich at 691.

 Id. at 692 (quotation marks and citations omitted).

 See, e.g., Canfield v City of Jackson, 112 Mich 120, 123; 70 NW 444 (1897); People v Pizzino, 313 Mich 97, 110; 20 NW2d 824 (1945).

 The prosecution conceded in the trial court that defendant had satisfied the other three factors. Therefore, I agree with the majority that we should not consider the prosecution’s argument, presented for the first time in this Court, that the newly discovered evidence is cumulative. *346 In any event, the prosecution’s argument regarding that factor lacks merit given that the new evidence contains information that goes beyond the evidence presented at trial.

 Spray v Ayotte, 161 Mich 593, 595; 126 NW 630 (1910), quoting 29 Mack, Cyclopedia of Law & Procedure, p 918.

 See, e.g., People v Serra, 301 Mich 124, 133; 3 NW2d 35 (1942) (“A new trial will not ordinarily be granted because of newly-discovered evidence to impeach a witness.”), citing Spray, 161 Mich 593.

 See, e.g., People v Davis, 199 Mich App 502, 516; 503 NW2d 457 (1993). As the majority observes, the case to which these decisions can be traced back, Graham v Inskeep, 5 Mich App 514; 147 NW2d 436 (1967), used language consistent with the general rule disfavoring new trials based on newly discovered impeachment evidence, thereby leaving open the possibility that a new trial may be granted in unusual circumstances.

 See, e.g., Kube v Neuenfeldt, 353 Mich 74, 82-83; 90 NW2d 642 (1958) (concluding that newly discovered evidence did not warrant a new trial when it was “merely cumulative” and “offered solely to impeach the testimony of” a witness); United States v Quiles, 618 F3d 383, 391-392 (CA 3, 2010).

 29 Mack, Cyclopedia of Law & Procedure, pp 918-921.

 Contrary to the majority’s assertion, I have accurately described the principles enunciated in the Cyclopedia. The majority expresses disagreement with my use of the word “particular” in describing the types of material statements that must be contradicted in order to warrant a new trial. As the majority recognizes, however, the Cyclopedia states that “[n]ewly discovered evidence to successfully contradict a witness upon a material matter may be cause for allowing a new trial, and it is no objection to such allowance that the evidence may incidentally impeach a witness.” It is difficult to discern how the majority interprets this language as referring to material statements that are somehow not particular. In any event, as this opinion will discuss, federal and state authorities support the proposition that newly discovered evidence to impeach a witness could make a different result probable on retrial if it directly contradicts material testimony by that witness at trial in a manner that tends to exculpate the defendant.

 United States v Saada, 212 F3d 210, 215-216 (CA 3, 2000).

 Id. at 215.

 Id. at 216.

 Id.

 Id. at 217.

 United States v Quiles, 618 F3d 383, 392.

 Id.

 Id. at 395.

 Id. at 393.

 Armstrong, 490 Mich 281.

 Id. at 286-287.

 Id. at 291.

 id.

 Id. at 291-292 (emphasis added).

 The complainant did not initiate the California police reports, hut she did initiate a police report in Michigan three years later reporting alleged childhood abuse, which led to the discovery of the California reports.

 People v Hackett, 421 Mich 338, 348; 365 NW2d 120 (1984) (emphasis added).

 Although the complainant did not report to the police the sexual nature of the assault in this case until more than a year later, i.e., after the events reflected in the California police reports, she did report the rape to at least four individuals within mere days of the assault. In particular, the complainant told her gynecologist and a friend about both the penile and digital penetrations within a few days of the assault, and she told her husband and an emergency room physician about the digital penetration within days as well. Thus, the alleged statements regarding sexual assaults contained in the California police reports, other than the vague references to childhood abuse, occurred after the rape in this case and after the complainant had reported the rape to at least four people. In no sense, then, has evidence been presented of any false accusations of rape in the past that may be admitted under Hackett.

 Id.

 See, e.g., People v Martin, 116 Mich 446, 453; 74 NW 653 (1898) (stating that a motion for a new trial was properly denied because the evidence on which the motion was based “was hearsay”); People v Borowski, 330 Mich 120, 128; 47 NW2d 42 (1951) (applying Martin to deny a new trial requested because of newly discovered evidence that “was based wholly on hearsay”).

 For example, Justice MARILYN Kelly’s concurrence develops an exculpatory defense theory that the complainant may have engaged in a “scheme” to make false rape accusations. Ante at 325-326. In considering this theory, I note that there is no evidence that the complainant fabricated her rape claim against defendant. She has never retracted her testimony regarding the rape in this case.

 People v Rao, 491 Mich 271, 279; 815 NW2d 105 (2012).

 Cress, 468 Mich at 692 (emphasis added).

 Defendant notes that the new evidence includes a purported hearsay-statement by the complainant allegedly reporting a rape in a parking lot in *354 California that was similar to the rape in this case. It is not clear, however, that any similarity would cut in favor of the defense’s theory and against the prosecution’s theoiy. According to the National Institute of Mental Health, flashbacks are a common side effect of a form of posttraumatic stress disorder that may result from a rape. “A person having a flashback may lose touch with reality and believe that the traumatic incident is happening all over again.” <http://www.nimh.nih.gov/health/publications/ anxiety-disorders/complete-index.shtml#pub4> (accessed July 30, 2012). The Rape, Abuse & Incest National Network indicates: “A flashback is when memories of past traumas feel as if they are taking place in the current moment. Many survivors of sexual violence experience these emotional returns to the trauma, believing themselves to be back at the scene of the attack or abuse.” <http://rainn.org/effects-of-sexual-assault/flashbacks> (accessed July 30, 2012). Moreover,
[fllashbacks can be triggered by many stimuli, such as sensory or emotional feelings. It can sometimes feel as though flashbacks come from nowhere, making it difficult to distinguish between past and present. They can often leave the survivor feeling anxious, scared, powerless, or any other emotions they felt at the time of their assault.
Some flashbacks are mild and brief, a passing moment, while others may be powerful and last a long time. Many times the individual does not even realize that s/he is having a flashback and may feel faint or dissociate. [Id. (citation omitted).]
Thus, given this possible explanation for the complainant’s hearsay statement in California describing an incident similar to the rape in this case and the prosecution’s representation that it has an expert who would support a theory that the complainant was suffering from post-traumatic stress disorder, defendant has failed to establish that the admission of the complainant’s statement would tend to support the defense theory.

 Even under the less demanding standard for establishing a violation of Brady v Maryland, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963)—which does not apply here because it is undisputed that no Brady violation occurred — “[t]he force of impeachment evidence ... is dimin *355 ished when the witness’s testimony is supported by substantial corroborating evidence or when the impeachment evidence is cumulative or collateral,” United States v Ramos-Gonzalez, 747 F Supp 2d 280, 291 (D PR, 2010), citing United States v Connolly, 504 F3d 206, 217 n 6 (CA 1, 2007); see also Smith v Cain, 565 US_; 132 S Ct 627, 630; 181 L Ed 2d 571 (2012) (“We have observed that evidence impeaching an eyewitness may not be material if the State’s other evidence is strong enough to sustain confidence in the verdict.”). Moreover, it is widely recognized that the Brady standard is more “defendant-friendly” than the standard for granting a new trial on the basis of newly discovered evidence. See, e.g., United States v Agurs, 427 US 97, 111; 96 S Ct 2392; 49 L Ed 2d 342 (1976); Connolly, 504 F3d at 212; United States v Frost, 125 F3d 346, 382 (CA 6, 1997); United States v Duke, 50 F3d 571, 576-577 (CA 8, 1995); United States v Johnson, 380 F Supp 2d 660, 678 (ED Pa, 2005). Thus, even under a more defendant-friendly standard for granting a new trial than the one that applies here, it is recognized that the force of impeachment evidence is diminished when the witness’s testimony is supported by strong corroborating evidence.

 Defense counsel suggested at oral argument that defendant might have forgotten that he owned the ring. But given that defendant initially denied to the police not merely that he had owned such a ring hut that he *356 had ever owned any jewelry whatsoever, it seems unlikely that a jury would believe that defendant entirely forgot that he once owned a gold nugget ring and then pawned it.

 Although portions of the Meijer parking lot were subject to surveillance video, the officer who reviewed the tapes testified that “[tjhey’re absolutely poor quality. You couldn’t see - just barely make out the cars themselves. Poor quality, we could not see anything on the tapes.” Also, a Meijer employee acknowledged that there were areas of the parking lot that the cameras did not cover and that it was difficult to identify people the further they were from the doors. The complainant testified that she parked between two vehicles, “quite a ways from the doors.” Further, the video of the parking lot is displayed inside the Meijer store. Thus, defendant, a Meijer employee, could have regularly watched the video to determine whether a particular area of the parking lot was covered by the cameras. As the prosecutor observed during closing argument, defendant “knew that parking lot. He knew that store. He knew what the video showed and what it didn’t show. And when he found his vulnerable victim, he took his chance.”
On a related note, although defendant notes that the attack occurred in a parking lot in daylight hours and that no one reported seeing the assault, the circumstances of the assault reflect that defendant took steps to minimize the chance of the complainant’s being seen or heard by others. The complainant, who was getting out of her minivan when defendant attacked her, testified that she fell back into her vehicle after defendant punched her face with his fist. She then fell farther back into the vehicle when he hit her again, causing her to lose consciousness with her head between the two front bucket seats of the vehicle. After the complainant regained consciousness and tried to sit up, defendant pulled her pants and underwear down around her knees. When the complainant *357 saw defendant’s erect penis and realized what was going to happen, she tried to sit up partway, but defendant hit her several times in the chest and collarbone to knock her back down, calling her “a stupid bitch.” Defendant then stated, “[T]his will shut you up” and, after sliding his ridged gold nugget ring to the middle knuckle of his finger, inserted his finger and the ring into her vagina. Reacting to the pain, the complainant called defendant a “bastard,” and in response defendant cut her face by striking her with the back of his hand. The complainant tried to scream, but it was difficult for her to breathe because of having been struck several times in the chest, which knocked the wind out of her. After defendant inserted his penis into the complainant’s vagina, she again lost consciousness.
Thus, given that (1) the attack occurred largely inside the complainant’s vehicle, into which defendant had pushed her and which was parked between two other vehicles “quite a ways from the doors,” and (2) defendant’s repeated battering of the complainant rendered her unconscious for part of the assault and made it difficult for her to breathe or scream, the evidence indicates that defendant’s own actions decreased the likelihood that anyone would see or hear the complainant as he beat and raped her.

 Just like the police officers who were unable to identify defendant before the lineup, the complainant was also unable to identify defendant after he changed his appearance for the lineup.

 The complainant testified that she went to the bedroom because her children were sitting in the kitchen and she did not want them to see her.

 According to the complainant, she did not tell her husband about the sexual nature of the assault at that point because “I wasn’t ready to face [it] myself. And I didn’t know how to break his heart.” Three days later, she told her husband about the digital penetration, but she did not disclose the penile penetration because “it was obvious he was in pain thinking about [the digital penetration], I could see what I was doing to him and I couldn’t go any further.”

 The complainant did not tell the officer about the sexual nature of the assault at this point because “I hadn’t told my husband. I couldn’t imagine him hearing it from someone else. And I wasn’t comfortable. Admitting it to [the officer] would he admitting it to myself.”

 The complainant testified that she did not disclose the rape during this first visit to the emergency room because she was in a room with six other beds and because she had already taken a shower and did not think anything could be done.

 The attending physician, a male, acknowledged that not all patients are comfortable with him and that female victims are sometimes uncomfortable telling male physicians about being raped. The physician further explained that he had “seen more alleged rape victims seen [sic] at a later time than at the time that the rape was committed” and that “[i]t’s not unusual to obtain more and more information as the patient opens up to the matter to gain more information as the days progress.”

 The complainant testified at the preliminary examination that she could identify a ring on the hand of the person in the car behind her, and she then explained at trial that she “identified that ring as being in the same position on his hand as the ring the day I was assaulted.” She did not, however, testify that it was the same ring as the one worn during the assault. As the prosecutor explained at oral argument, the point of this testimony was not to establish that defendant actually was the person driving behind her that day or that the person was wearing the same ring that defendant was wearing on the day of the assault, but that the complainant’s observation of a person matching defendant’s description was what led her to report the sexual nature of the assault to the police.

 People v Grissom, unpublished opinion per curiam of the Court of Appeals, issued October 29, 2009 (Docket No. 274148), p 10. The Court of Appeals majority’s reasoning is consistent with the principle, discussed in the less demanding Brady context, that “[ilmpeachment evidence, even that which tends to further undermine the credibility of the key Government witness whose credibility has already been shaken due to extensive cross-examination, does not create a reasonable doubt that did not *362 otherwise exist when that evidence is cumulative or collateral.” United States v Sanchez, 917 F2d 607, 618-619 (CA 1, 1990) (citation and internal quotation omitted); see also Connolly, 504 F3d at 217.

 Grissom, unpub op at 10 n 16.

 Or as the prosecutor stated during closing argument at trial:
Lots of people have skull tattoos on their right upper arm who work at Meijer with a gold nugget ring who were working that day? I don’t think so. And I trust your reason and logic and common sense in assessing that testimony. There could be dozens of people walking around with skull tattoos, but not there, not working at Meijer, not with a gold nugget ring. And not in the 7800 photographs that [the complainant] picked this Defendant out of.
... It’s not a coincidence. You can’t explain it away. She picks out that photograph from nearly 8,000. He works at Meijer. He’s working an hour and a half after this happened. He’s got a ring. He’s got the tattoo exactly where she said it was. You can’t explain away that evidence.

 Graham., 5 Mich App at 524.

 See Quiles, 618 F3d at 393 (“Determining the strength and importance of the exculpatory connection or the significance of the newly discovered evidence with respect to the credibility of critical evidence given at the trial is a difficult task that is left in the first instance to the *364 discretion of the [trial] court.”). In her separate concurring opinion, Justice Marilyn Kelly says that the judge who tried this case has now retired, that a new judge will be assigned on remand, and that my discussion of the deference owed to the trial court is thereby unfounded. But as my analysis makes clear, I am deferring to the original trial judge who already denied defendant’s motion for new trial; this is the very same judge who tried the case and heard the evidence. Thus, it is entirely appropriate to accord deference to the trial court. I also note that it is not uncommon for a retired judge to be temporarily assigned to address a matter on remand.

 People v Cooper (On Rehearing), 328 Mich 159, 162; 43 NW2d 310 (1950); see also Klooster v City of Charlevoix, 488 Mich 289, 310; 795 NW2d 578 (2011). The majority inexplicably ignores this alternative basis on which to affirm the trial court’s decision. Indeed, the majority fails even to acknowledge, let alone apply, the widely recognized and entirely uncontroversial principle that a correct result may be affirmed *365 even if reached for an incorrect reason. It is not clear why the majority declines to affirm on this alternative ground.

 In Cress, 468 Mich at 685, this Court noted that the trial court in that case had granted the prosecution’s motion to reopen proofs regarding the defendant’s motion for a new trial. In my view, the majority’s language here should not be read to preclude when appropriate the possible reopening of the record as discussed in Cress. I express no definitive view on this point with respect to this case because I conclude that a different result is not probable on retrial given the facts presented in the newly discovered evidence and at the original trial.